**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**PORTER COUNTY FARM BUREAU CO-OPERATIVE ASSOCIATION, IN-CORPORATED, Respondent.**

No. 13708.

United States Court of Appeals
Seventh Circuit.

Feb. 14, 1963.

134

Marcel Mallet-Prevost, Asst. Gen. Counsel, Solomon I. Hirsh, Atty., Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Jules H. Gordon, Atty., N. L. R. B., Washington, D. C., for petitioner.

Daniel F. Kelly and Allen W. Teagle, Hammond, Ind., Tinkham, Beckman, Kelly & Singleton, Hammond Ind., of counsel, for respondent, Porter County Farm Bureau Co-operative Ass'n, Inc.

Before KNOCH, CASTLE and SWYGERT, Circuit Judges.

KNOCH, Circuit Judge.

This case is before us on the petition of the National Labor Relations Board for enforcement of its order against respondent Porter County Farm Bureau Co-operative Association, Incorporated, pursuant to the provisions of Section 10 (e) of the National Labor Relations Act, as amended, Title 29 U.S.C. § 151 et seq. No jurisdictional issue is presented. The Board's decision and order are reported at 133 NLRB (No. 105) page 1019.

The respondent is engaged in retail marketing of farm supplies, grain and related products at its main plant in Valparaiso, Indiana, and at three branches in Malden, Wheeler and McCool, Indiana. During the year 1958, the respondent had about 29 production employees exclusive of supervisors and clerical employees. About 17 were at some time or other members of General Drivers, Warehousemen and Helpers Union Local No. 142, an affiliate of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, the charging party, hereinafter called the "Union." There was no election or certification of the Union as the collective bargaining agent for respondent's employees, nor determination as to the appropriate bargaining unit. However, for some twelve to fifteen years prior to the charges which gave rise to these proceedings, the Union and respondent have had collective bargaining agreements concerning respondent's "truck-driver" employees.

David Cooper, general manager for respondent, called as an adverse witness by the General Counsel for the Board, in the hearing before the Trial Examiner, testified that almost all the above-mentioned twenty-nine employees drove trucks, that some employees who were never members of the Union worked under similar conditions, at the same rates of pay, and drove trucks as much or more than other employees who were members of the Union.

Four of respondent's drivers who were members of the Union are petroleum driver-salesmen. They own their own trucks, make their own sales and collections, and are paid strictly on a commission basis.

The above-mentioned earlier collective bargaining agreements were negotiated between the Union and a multi-employer group, engaged in the lumber, coal, building material, and feed industries. Respondent's type of operation was unique among the group. After joint negotiations, each individual employer firm would sign an individual contract with the Union on the same terms as negotiated by the group. The last agreement provided for automatic extension absent a written 60-day notice. It expired June 30, 1958. That agreement made no provision for checking off dues and contained only one job classification applicable to respondent: truck drivers, with an hourly straight time rate of $2.25, plus for the second year of the two-year contract, an increase of ten cents per hour over the first year's rate. No provisions were made for the four driver-salesmen. One of these testified that some seven or eight years before, these driver-salesmen ceased to pay dues to the Union "until the Union told us we had to."

On April 1, 1957, David Cooper became respondent's general manager in charge of the general administration of respondent's three grain elevators and feed stores, implement, petroleum and store departments. He was responsible to the twelve-man Board of Directors elected by the common stockholders. Any patron or customer whose volume of business with respondent earned sufficient savings to warrant issuance of a share of common stock became a common stockholder. Most of the employees held common stock. Many including the four driver-salesmen, also owned preferred stock, which common stockholders could buy as an investment.

Kermit Anderson, a member of the Board for ten years, had been Chairman for six years at this time. The new gen-

eral manager, David Cooper, had no experience in handling union negotiations.

Pursuant to a "re-opener" clause in the contract, Michael Sawochka, who had been the Union's Secretary-Treasurer for more than 20 years, wrote the various employer firms on April 29, 1958, that the Union desired to open negotiations as to the terms of the contracts.

April 30, 1958, the respondent advised that respondent would conduct its labor relations on an individual basis.

Preparation for joint negotiation continued with the other employers, but the contract with respondent was allowed to expire. At that point, respondent ceased checking off dues. The Trial Examiner found dues were checked off and forwarded quarterly for a period beginning prior to 1955, although the earliest check-off authorization blanks in evidence, to which reference will be made below, were dated July 30, 1958. The Trial Examiner found that dues were checked off for a salaried supervisory office employee and an office manager, each of whom had at one time driven a truck for respondent.

On July 14, 1958, Mr. Sawochka and John Kopach, a business representative of the Union, met with Mr. Cooper and Mr. Anderson. The Trial Examiner found the testimony of Mr. Cooper and Mr. Anderson more convincing where their evidence conflicted with that of Mr. Sawochka who testified after they did as to the events of this meeting. The Trial Examiner found that topics of general interest were discussed; that Mr. Anderson had explained the inability of a co-operative (such as respondent) to pass its costs on to the farmers who dealt with the co-operative, that some of the departments were losing money, that a different contract from that made with the jointly negotiating employers was needed; that Mr. Cooper suggested a rate range through which an employee might advance; that Mr. Kopach suggested that this might be already in process of trial as John Landgrebe had been hired at only $1.35 per hour. The Trial Examiner notes that John Landgrebe was hired on a part-time basis to clean the cob shed and haul cobs a short distance on respondent's property to burn them; that occasionally when respondent was short-handed, he would drive a regular truck. Mr. Sawochka thought a rate range would not work. Mr. Sawochka and Mr. Kopach then left for a meeting with the other employers, promising to get in touch with respondent when the Union knew how the joint negotiations were developing.

Although Mr. Cooper felt that some employees were improperly covered by the Union and had discussed the desirability of an election with respondent's attorney, nothing about an election or definition of the appropriate bargaining unit was stated by the representatives of either respondent or the Union. The Board, as indicated more fully below, considers this omission as reflecting adversely on the existence of respondent's good faith doubts as to representation and bargaining unit. The Trial Examiner did not so construe it, on the basis of his findings on the issue of credibility of the witnesses. This was Mr. Cooper's initiation into handling union negotiations. For the first time, negotiations were to be held on an individual basis. There had been no prior certification of the Union or determination of the appropriate bargaining unit. The Board's reliance on the "historical" unit and failure to dispute it in the past seems unreasonable to us in the light of changes made and contemplated in the negotiation of a new contract. Past history of bargaining, not predicated on a Board certification, is not controlling on the issue of what constitutes an appropriate bargaining unit. J. C. Penney Co., 86 NLRB 920, 921, 922 (1949); Andrews Industries Inc., 105 NLRB 946, 949 (1953); General Electric Co. (River Works), 107 NLRB 70, 72 (1953). The credibility of the witnesses as heard and seen by the Trial Examiner is the vital issue in determining whether a good faith doubt existed in this case.

July 21, 1958, respondent filed a petition for a representation election in which the appropriate unit was described as

numbering twenty-nine, including all employees except office clericals, guards, supervisors and professional employees. The Trial Examiner notes that some truck driving is included in the work of all twenty-nine; some drive rarely, but for others, driving is a major part of their work.

July 30, 1958, the Union filed an unfair labor practice charge, charging the respondent with refusing to bargain in good faith. The Union, however, had not requested any meetings with respondent during the period from July 14, 1958, when the Union representatives promised to get in touch with respondent, and July 30, 1958, when the charge was filed. The charge was later withdrawn. Mr. Sawochka, in his testimony, admitted the charge was filed to block the election.

The Union later, on November 10, 1958, filed a second unfair labor charge, which gave rise to the instant proceedings, charging respondent with refusal to bargain in good faith, unilateral installation of an insurance program, interference with employee rights, and coercing of employees by surveillance of a Union meeting, solicitation of employees to abandon a strike and to withdraw from the Union, and assistance in effecting such withdrawal from the Union.

At the time of the first charge, the Union began to secure dues check-off authorizations. Eight were in evidence, bearing dates from July 30, 1958, to October 27, 1958.

Under the expired contract, respondent was obliged to pay into the Union's "Health and Welfare Trust Fund, the sum of $2.75 per week per employee covered." The last payments had been remitted in July covering the period through June, when the contract had expired.

The evidence included a letter dated August 26, 1958, from respondent's attorney to the Union, explaining this fact in answer to "an undated form letter concerning delinquent reports and payments to your Health and Welfare Trust Fund and your Pension Fund." The form letter mentioned is not in evidence.

The Trial Examiner found that an accident concerning a school bus in which the child of one employee was riding (though fortunately not injured) and the birth of a child on July 28, 1958, to another employee, Lee Betz, aroused concern as to whether the employees were covered by the Union insurance. Subsequently, to provide coverage for Mr. Betz, respondent paid a special premium to the Union for the month of July. Mr. Betz did not receive payment of his claim until after September 16, 1958.

On September 9, 1958, the Union held a meeting with the employees of all the joint employer firms and the employees of respondent. The evidence was in conflict as to what occurred at this and other meetings. Mr. Sawochka, on September 9th, asked the employees to ratify the contract proposed in the joint negotiations to which respondent was not a party, pointing out that approval by the membership could lead to a strike against any employer, including respondent, who failed to sign it. After discussion, there was a standing unanimous vote approving the proposed agreement. The Trial Examiner was convinced by the weight of the evidence that the only question actually voted on was approval of the proposed wage scale; that no strike vote, as such, was taken; and that nothing was said about the Union's carrying insurance benefits to cover respondent's employees.

Over the period from September 15 to October 31, 1958, according to the Union's ledgers, sixteen of respondent's employees, whose dues were no longer being checked off, paid dues directly to the Union. Three of the four oil driver-salesmen, who all paid their dues on September 16, 1958, stated that they did not want a strike and were told by Mr. Kopach that if they paid their dues there "would be no strike."

The Trial Examiner notes that Mr. Anderson credibly testified that the Board of Directors had been "wondering

whether the employees were covered" by Union insurance, and they instructed Mr. Cooper to call a meeting. Mr. Cooper called such a meeting for September 16, 1958, with those employees for whom respondent formerly paid insurance premiums to the Union. The Trial Examiner lists a number of employees in addition to the two previously named who testified "credibly" and "convincingly" to their expressions of concern on this point, and to the fact that Mr. Cooper called them together "to bring up temporary insurance that would cover us until this was settled" or they "knew what the score was." As indicated above, Mr. Betz at this time had not yet received payment of his claim despite the special premium paid for him. The Trial Examiner found that there was genuine concern among the employees, which became known to respondent. Mr. Cooper offered a plan to assure the employees of hospitalization protection in line with the respondent's general practice which was available to all employees and which had been applicable to the drivers prior to the Union plan. About one-third of the employees present had continued to carry the respondent's hospitalization insurance, which was provided through Hoosier Farm Bureau Insurance Company, along with the Union insurance. An agent of Farm Bureau Insurance Company was present. He explained that a 90-day waiting period applied to individuals, but that no waiting period would be required if these employees chose to come in as a group. The Trial Examiner expressly found that Mr. Cooper in no way represented this plan as superior to that of the Union, but only as a means of providing coverage which could later be dropped. There was a unanimous vote for coverage and the plan was set up with respondent and the employees sharing the cost.

Pursuant to a telephone call from Mr. Sawochka to Mr. Anderson, a meeting between Messrs. Sawochka and Kopach, representing the Union, and Mr. Cooper, representing respondent, was set for October 1, 1958. Again the Trial Examiner analyzed the testimony of the three men present, and decided that, after Mr. Sawochka objected to having Mr. Cooper's secretary take notes and it was agreed she would take none, the representation petition filed by respondent was discussed, and Mr. Sawochka stated that he would never consent to an election. He asked to come before the Board of Directors after Mr. Cooper said that they had given no sign of reversing their decision on the petition for election.

In response to Mr. Cooper's urging the holding of an election on the ground that he did not know whether respondent's employees did or did not want the Union, Mr. Sawochka stated that a number had already paid dues directly to the Union. There was a sharp conflict in the evidence. Mr. Sawochka testified that he offered to show "paid up Union receipts for practically every man" which Mr. Cooper did not want to see. Mr. Cooper testified that no statement was made as to the number paid, their names, nor as to any offer to exhibit records. The Union ledger at that time would have shown fourteen employees had paid dues through the end of September 1958. This would have been just under half of the respondent's claimed appropriate unit. The Trial Examiner thought it unlikely the ledger would have been brought to this meeting. Besides, no fourth quarter dues for 1958 had yet been paid. The Trial Examiner also decided that it was "very unlikely that the Union had by that time secured current check-off authorizations from even as many as half of the employees who had formerly had dues deducted." The Trial Examiner found that the Union had not really tried to induce Mr. Cooper to accept Union records in lieu of an election. Nothing was said at this meeting about insurance coverage or respondent's action respecting it. Mr. Sawochka offered respondent the same contract as signed by some of the jointly-negotiating employers. This was a three-year contract with wage increases as approved by the employees at the aforementioned meeting of September 9, 1958. Like the

earlier contract, this one contained no provision for the commission-paid driver-salesmen. Mr. Sawochka continued to seek an interview with the Board. Mr. Anderson testified that he signed the petition for an election because he honestly felt from statements heard over a period of years that there was employee dissatisfaction with the Union and that it did not represent a majority. Mr. Sawochka wrote each member of the respondent's Board of Directors asking them to investigate General Manager Cooper's alleged purpose of cutting wages through first eliminating the Union, to the end that a serious strike might be prevented. He enclosed a copy of the contract signed by the other employers and offered to meet with the Board. No mention was made of the insurance coverage matter. There is no evidence of any reply to this letter.

On November 4, 1958, a meeting was held at the Union Hall attended by those Union members who were employees of respondent, John Kopach, Michael Sawochka and his brother, Andrew, a business representative of the Union, John Heil, and Robert O'Brien, respectively president and vice-president of Local 718, a Chicago Local of Teamsters. Michael Sawochka, who presided, told the respondent's employees that they were on strike although none of them would be asked to do picket duty, and that they could go to work only by going through a picket line. The Trial Examiner found that no vote of any kind was taken at this meeting of November 4, 1958, and that respondent's employees genuinely believed that they were never given an opportunity to vote specifically on whether or not they wanted to go on strike. After the meeting, Mr. Sawochka and Mr. Heil visited Mr. Cooper to tell him that a strike had been called. The strike involved all four of respondent's locations, picketing being continuous at Valparaiso and Wheeler and intermittent at the other two locations.

The driver-salesmen, who, as indicated, had expressed opposition to any strike, at once began conferring with each other.

They had substantial investments, including preferred stock and their own oil trucks, beyond their interest in the good will of their customers from whom they were receiving calls for heating and operating fuel during the early days of the strike.

About noon of the first day of the strike (which was also election day) three of the driver-salesmen called on Mr. Anderson who was working at the Courthouse with the Election Board. From the "credited testimony" of Clarence Powell (the leader in the "back to work movement" which spread from the driver-salesmen to the other strikers) the Trial Examiner found that the gist of the conversation with Mr. Anderson was that the three would like to return to work. Individual driver-salesmen telephoned Mr. Cooper to tell him the same thing and to discuss problems created by the picket-line. At a Board of Directors meeting in the evening of November 4th, Mr. Cooper was instructed to provide any protection needed for any strikers who should return to work. The Trial Examiner credited Mr. Cooper's testimony, on examination by the General Counsel, and admitted without objection, that on or about November 5th, Lane Young, Jr., a hired trucker, informed him that as he was leaving the Valparaiso plant after coming in with a load of grain, he was threatened by a carload of men at the picket-line. Mr. Young had secured an escort across the picket-line onto the road from the Sheriff's office.

About November 6th, respondent wrote all its employees denying that respondent intended to cut wages, expressing the belief that the strike arose out of the respondent's petition for a representation election; and stating that the respondent would abide by the results of such an election. Parts of this letter were quoted in the local press. On November 6th, the four driver-salesmen met with Mr. Anderson, at his farm, where they were later joined by Mr. Cooper. The Trial Examiner stresses the personal basis of the relationships in this case. The customers of the driver-salesmen were personal

friends and neighbors. The stockholders, employees and employer, were fellow farmers, neighbors, and even relatives. He found that these relationships and rural folkways made the dividing line between employer and employee more tenuous and less meaningful here than in larger urban plants.

The Trial Examiner found that the four driver-salesmen made it clear at the November 6th meeting that they wished to return and asked for help in accomplishing that end; that they expressed fear of violence from the Union to stop them; that Mr. Cooper promised to try to provide some protection. The Trial Examiner was satisfied that actual fear and expression of that fear existed.

On the morning of November 7th, the four driver-salesmen came to Mr. Cooper's office stating that they had decided to resign from the Union and that they wished to be "deputized." During the course of discussing methods of operation, loading, volunteers from the Board of Directors to drive with them, etc., Mr. Cooper, at the request of Mr. Powell, wrote out, in longhand, a suggested form of resignation. Later, in discussion alone with the other three driver-salesmen, Mr. Powell drafted another form, incorporating some of Mr. Cooper's draft. All four signed. At Mr. Powell's request, Shirley Miller, then the respondent's bookkeeper, typed up an original and copies on plain paper. All four signed the original. The bookkeeper, a notary public, acknowledged their signatures. Shirley Miller later became an assistant office manager. At the time of which we are speaking, however, she was without any supervisory or managerial authority and customarily typed and notarized documents for employees. The Trial Examiner found that the decision of the four to resign was their own decision. Later that day, the resignation, in a sealed envelope addressed to the Union's office in Gary, Indiana, was given by Mr. Powell to Mr. Cooper, who was going to the Post Office, with the request he send it by registered mail, which he did.

All four driver-salesmen were deputized by the Sheriff. They did not carry arms, but often had friends ride with them.

The Trial Examiner found that the respondent's letter to its employees, mentioned above, and the action of the four driver-salesmen, were the subject of considerable discussion among the striking employees who also discussed the possibility of inducing interested farmers to support the strikers' return to work. On Sunday morning, November 9th, Mr. Anderson and Mr. Cooper met at the home of Jack Aylesworth, secretary of respondent's Board of Directors, at the latter's invitation. Mr. Aylesworth told the others he heard farmers at one of the grain elevators saying they wished to lend their support to returning employees. These three men then decided to suggest to interested persons that they might lend support by their presence the following morning, Monday, November 10th. Mr. Cooper called two or three persons. Mr. Anderson called at least two, and the Trial Examiner found no reason to believe that Mr. Aylesworth was less active.

Meanwhile, on Sunday afternoon, November 9th, other striking employees invited the driver-salesmen to a meeting where almost all of the sixteen original strikers were present. Mr. Powell acted as chairman. The general trend of discussion favored return to work, and Mr. Cooper was invited to join the meeting. He came. This is the meeting which the complaint alleges constituted direct negotiation with the employees and solicitation of them to abandon the strike. The Trial Examiner believed that Mr. Cooper may have explained the idea behind the rate range he had suggested to the Union, but that there was nothing to indicate that he suggested any change in terms or conditions of employment. The Trial Examiner was satisfied that Mr. Cooper expressed the willingness of respondent to have the strikers return to work at the same rates and conditions as before the strike, and that no bargaining respecting changes occurred. In response

to employees' concern over possible violence, Mr. Cooper credibly testified that he told them of the move among farmers, stockholders, and patrons to appear before the Union Hall to offer moral support and protection from violence. After Mr. Cooper had left the meeting, the employees voted unanimously to return to work, and, in a separate vote, unanimously to resign from the Union. The Trial Examiner notes that David Greenlee credibly testified that the employees decided informally to go down to inform the Union, without entering the Hall, or attending the Union meeting set for Monday morning, to notify the Union, that they were not continuing the strike. It was, also informally, decided to ask John Aylesworth to act as spokesman for them.

On their way home, several employees, who passed the residence of Ronald Graham (who had not attended the meeting) stopped in to tell him about the meeting. Mr. Graham testified that he told them that, if everybody wanted to go back to work, there was nothing else for him to do. The Trial Examiner characterizes Mr. Graham as apparently the only employee witness whose credibility is not assailed in the General Counsel's brief. He testified to the information given him by other employees about the meeting Sunday evening, and also testified that he understood farmers were to be present to afford protection; that while he personally did not think so, "some of the men thought there was going to be violence."

By 10:00 a. m. Monday, the employees who were to have attended the meeting, assembled before the Union Hall in Valparaiso, Indiana. There were also, in the immediate vicinity, some farmers variously estimated at from 30 to 100 in number. The Trial Examiner in making his findings concerning this incident (which the complaint characterizes as surveillance of a union meeting and restraining and coercing employees from attending) gave consideration to the ambiguities, inconsistencies, conflicts, relative credibility of the various witnesses, and the emotional stress under which the events were observed. The Hall is almost in the center of town, about two blocks from the courthouse. The Trial Examiner believed that some of the persons in the crowd were mere curious bystanders. There was no evidence that any of the employees tried to enter the Hall. Mr. Kopach appeared at the door and told David Greenlee to come in, that he was on the wrong side of the fence. Mr. Greenlee declined. Later, when Mr. Kopach came to the door of the Hall, Mr. Powell and Mr. Aylesworth told him that all the employees decided to return. Mr. Anderson then asked him to remove the pickets, mentioning the presence of "angry farmers" there for moral support and stating he wanted nobody hurt when the employees returned to work. Still later, Mr. Anderson and Mr. Aylesworth entered the Hall on the invitation of Mr. Kopach to talk to Mr. Michael Sawochka on the telephone. There was a conflict in the testimony of Mr. Sawochka and Mr. Anderson concerning this telephone conversation. Mr. Kopach was not called as a witness. Mr. Sawochka's version suggests a menacing attitude to Mr. Anderson's remarks about "angry farmers" which the Trial Examiner thought was exaggerated. He did think it quite possible that Mr. Anderson did refer to "angry farmers" in trying to get the pickets removed. He found that when Mr. Anderson did tell Mr. Kopach that the farmers were there for moral support and asked why the pickets would not be removed, Mr. Kopach answered, "Sign the contract."

In any event, the crowd broke up shortly thereafter. The Trial Examiner found that no farmers in the crowd blocked the Hall entrance or massed in front of it; there were no signs or any evidence that anyone noted down names, or that anybody attempted to induce employees not to enter the Hall or to return to work. By 11:30 a. m. the employees, without incident, returned to work. They have continued at work, despite Union picketing.

The same day the Union filed the original charge in this proceeding, alleging

violations of Sections 8(a) (1), (3) and (5) of the Act, refusing to bargain since October 15, 1958 (the earlier charge which had been dismissed put the date at April 30, 1958), threatening the driver-salesmen on November 7, 1958, with discharge unless they resigned from the Union, blocking the entrance to the Union Hall on November 10, 1958, and threatening the employees if they entered the Hall or continued the strike. Late in the evening of November 11, 1958, Mr. Sawochka telephoned Mr. Anderson. On "convincingly given" testimony of Mr. Anderson, the Trial Examiner found that Mr. Sawochka told Mr. Anderson (in answer to Mr. Anderson's question about holding an election) that he could not afford an election here lest others in the same county also demand elections; that he "would slap an unfair labor practice charge against" respondent and "as soon as [respondent] got out * * * he'd slap another on * * *." The charges have effectively postponed the election sought by respondent.

On November 20, 1958, a registered document was mailed to the Union's Gary office in an envelope of the respondent. It was a resignation similar in terms to that of November 7, 1958, and was signed by the other twelve striking employees. There was no showing that Mr. Cooper had anything to do with the signing of this document to which the Trial Examiner thinks signatures were affixed on two or more occasions. It is his finding that Mr. Powell took the initiative in preparing the document, using his own prior draft as a pattern, having it (and the envelope in which it was mailed) typed and notarized by Shirley Miller.

On February 20, 1959, the Union amended its charge substituting the date of April 30, 1958, as the date of alleged refusal to bargain and adding an allegation that on or about November 7, 1958, respondent instigated formation of an independent union. However there were no allegations with regard to the independent organization of respondent's employees, which has since been formed. The Trial Examiner ruled at the hearing that this organization was not in issue and the matter was not further litigated.

■ The Trial Examiner held that the facts as found by him did not support the allegation that respondent had refused to bargain with the duly designated representative of all of its truckdrivers by engaging in a course of conduct to undermine the Union. He noted (inter alia) that there had never been a Board determination of the appropriate unit nor election to decide the wishes of the employees. Standards for determining good faith doubts after a Board certification cannot be controlling here. There was a new general manager, there had been financial difficulties. No adverse inference could be drawn from a desire for separate contract negotiations. Yet the Union dates its refusal to bargain, in two of the three charges filed, from the date of the request for separate negotiations. The Trial Examiner concluded that after the meeting of July 14, 1958, and Mr. Cooper's initial dealings with the Union, his confusion as to which employees the Union wished to represent was natural; he also felt that respondent's proposed unit with one or two exclusions was a more appropriate one than that proposed by the General Counsel, where only eight of the fourteen employees included would spend a majority of the time driving trucks on a wage basis. The remaining six would include the four driver-salesmen who work on commissions only and whose conditions of work have never been covered by the contract, and two corn sheller operators. Another individual who spends almost all of his time driving a truck on an over-the-road basis between Indianapolis and Valparaiso is excluded, as is a warehouseman and feed mill helper, although both used to have dues checked off and both were called out on strike.

■ Certainly the unit proposed by the respondent was a plausible one which, as the Trial Examiner found, could not be said under all the circumstances of

this case, to have been advanced in bad faith. The fact that representatives of respondent met with Union representatives, in the context of this matter, cannot support an inference that respondent abandoned its desire for an election. Respondent continued to press for an election, while the Union merely sought to impose a contract almost identical to that signed by the other employers with no provision for respondent's different situation.

■ It is clear that the employees were concerned about insurance coverage; respondent was no longer paying premiums to the Union; respondent had been obliged to pay a special premium for Mr. Betz even though his wife had obviously become pregnant long prior to the expiration of the contract. Under the circumstances, outlined earlier in this opinion, making available to these employees the same insurance benefits previously enjoyed by them and currently enjoyed by other employees, cannot be held to constitute refusal to bargain by unilaterally installing an insurance program or by negotiating directly.

■ When Mr. Cooper was invited to participate in the meeting of November 9, 1958, the employees were already desirous of returning to work and were concerned with means for doing so. Under all of the attendant circumstances, there was no support, and the Trial Examiner so found, for concluding that respondent refused to bargain by engaging in a course of conduct calculated to undermine the Union. The Trial Examiner, therefore, recommended dismissal of the allegations of the complaint respecting refusal to bargain. He decided that, on the basis of the facts he had found, the initiative for the meetings of November 6th and November 9th came from the employees; that neither Mr. Anderson nor Mr. Cooper solicited the employees to abandon the strike or to withdraw from the Union. Such assistance as the Trial Examiner found to have been given by respondent's representatives was given in response to the request of the driver-salesmen, whose operations were not covered by the past contracts, and who were accustomed, the Trial Examiner found as a fact, to securing such clerical service and ministerial assistance from respondent. He found no evidence of anti-union animus, no pattern of unfair labor practices.

With respect to the assembling of the farmers about the Union Hall, the issue of credibility, vital throughout this case, is of primary importance. The Trial Examiner who heard and saw the witnesses found that respondent was acting in response to expressed fears of violence against respondent's employees who had clearly indicated a desire to return to work. Nobody can now say whether the presence of these farmers did not in fact prevent the violence which some of the employees feared. As to surveillance, Mr. Anderson and Mr. Aylesworth were invited into the Union Hall for a telephone conversation and left as soon as it was over. Nobody took notes. A photographer was present, but he apparently came because of the news aspect of the situation.

■ The Trial Examiner recommended dismissal of the complaint in its entirety on the basis of his findings of fact and his conclusions therefrom, which we believe to be well supported by the record as a whole. We have outlined the findings in some detail because of the action taken by the Board which found no prejudicial error in the hearings, and affirmed the rulings of the Trial Examiner, but adopted his findings, conclusions and recommendations only insofar as they were consistent with the Board's own decision.

■ The Board concluded that respondent must have been aware that the Union was claiming to represent the same employees it had represented for many years, in the multi-employer joint negotiations, only now on a single employer basis. The Board held that the historical unit which had not been disputed was an appropriate unit on a single employer

basis. In dealing with the issue of a good faith doubt of the Union's majority status, the Board disregarded the factual findings of the Trial Examiner, many as previously indicated turning solely on the issue of credibility. The Board considered that "unilateral action with respect to its insurance plan, without notification to the Union * * * could only result in the disparagement of the Union's position as bargaining representative of the employees" and constituted a violation of Section 8(a) (5). Nor did the Board consider such slight assistance as was rendered in effectuating withdrawals from the Union to be merely ministerial; the Board viewed it as an effort to undercut the Union's majority status and violative of Section 8(a) (1). The Board frankly disbelieved the motives stated (and accepted by the Trial Examiner) for inviting the farmers to assemble outside the Union Hall. The Board thought that this action was motivated by a desire to discourage the strikers from changing their minds and to discourage the Union representatives from approaching the employees. Incidentally, coercion of the Union representatives was not one of the issues raised in the complaint. The respondent was entitled to timely notice of the charges against it. N. L. R. B. v. E. & B. Brewing Co., 6 Cir., 1960, 276 F.2d 594, 598. The Board argues that the Union representatives were "genuinely frightened" and that the action interfered with the employees' rights because it isolated them from the Union. The Trial Examiner had found the assembly was designed to protect the employees. Apart from speculation and conjecture, there is nothing to support the Board's disbelief of the facts as found by the Trial Examiner. But the Board held that this activity constituted an independent violation of Section 8(a) (1).

On its own view of the motivation for respondent's actions, the Board held that the petition for election was filed in bad faith and in violation of Section 8(a) (5) to impose an unnecessary obstacle to collective bargaining amounting to a refusal to bargain.

We are of the opinion that the Board has failed in the requisite proof that respondent had violated the Act in the various steps taken by respondent. In order to support its conclusions, the Board has drawn unreasonable inferences from the facts shown, and has made findings of fact diametrically opposed to those of the Trial Examiner on the very issue of credibility of the witnesses with no evidence to show that the determinations of the Trial Examiner were incorrect.

The material facts here depend to a large degree, as stated, on the determination of the credibility of the witnesses as shown by their demeanor or conduct at the hearings. As the Supreme Court has said:

"The 'substantial evidence' standard is not modified in any way when the Board and its examiner disagree. We intend only to recognize that evidence supporting a conclusion may be less substantial when an impartial, experienced examiner who has observed the witnesses and lived with the case has drawn conclusions different than the Board's than when he has reached the same conclusion." Universal Camera Corp. v. Labor Board (1950), 340 U.S. 474, 496, 71 S.Ct. 456, 468, 469, 95 L.Ed. 456.

See also N. L. R. B. v. Popeil Brothers, 7 Cir.1954, 216 F.2d 66, 70. Snow v. N. L. R. B., 9 Cir., 1962, 308 F.2d 687, cited by the Board, is easily distinguished on its facts. There "twelve company employees signed cards containing a declaration that the signer was applying for membership in the union and was authorizing the union to be his bargaining representative." The next morning nineteen more signed such cards. The thirty-one employees constituted a majority of the unit of the forty-nine then employed by the com-

pany. Management representatives expressed a desire for a Board-supervised election. A union official suggested that a disinterested party check the signatures on the cards which the union held. This suggestion was accepted by management. It was agreed that the check be made by a clergyman, who was given W-2 income tax forms for each of the employees. He compared the two sets of signatures and submitted a written report verifying the signatures of the thirty-one who signed the cards. The Trial Examiner found that management acted in good faith in refusing to negotiate with the union until its majority representation was established by a Board-supervised election. The Ninth Circuit opinion indicates (at page 690, footnote 3):

> "The basis of this conclusion is not clearly indicated by the trial examiner's intermediate report and recommended order. The trial examiner may have concluded that the Snows [management] genuinely doubted the union's majority status. On the other hand, he may have proceeded on the assumption that in the absence of a purpose to dissipate union strength, an employer may insist on a Board election even though he knows that the union represents a majority of his employees."

The Board found contrary to the Trial Examiner on this issue. In analyzing the evidence, the Ninth Circuit remarks that the clergyman selected by management representatives as a neutral person to examine the signatures informed them in writing that the cards were applications for union membership. The Ninth Circuit held that once management had received such information from a reliable source, insistence on a Board-supervised election could no longer be defended on the ground of a genuine doubt of a majority representation.

The petition of the Board for enforcement of its order is denied.