Mickey GRECO, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent,

and

Continental Can Company, Inc.

and

United Papermakers and Paperworkers, AFL–CIO, Intervenors.

No. 14422.

United States Court of Appeals Third Circuit.

Argued Dec. 2, 1963.

Decided April 22, 1964.

Caesar C. Guazzo, New York City, for petitioner.

Paula Omansky (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Melvin J. Welles, Attys., National Labor Relations Bd., on the brief), for respondent.

Rothbard, Harris & Oxfeld, Newark, N. J., Samuel L. Rothbard, Abraham L. Friedman, Newark, N. J., on the brief, for intervenor-respondent, United Papermakers and Paperworkers, A.F.L.–CIO.

Charles J. Biddle, Drinker, Biddle & Reath, Philadelphia, Pa., W. S. Ryza, James G. Davis, Pope, Ballard, Uriell, Kennedy, Shepard & Fowle, Chicago, Ill., on the brief, for intervenor, Continental Can Company, Inc.

Before STALEY, GANEY and SMITH, Circuit Judges.

STALEY, Circuit Judge.

Petitioner Mickey Greco seeks review of an order of the National Labor Relations Board dismissing an unfair labor practice complaint based upon his charges that he and several other co-workers were wrongfully discharged from employment by the intervenor, Continental Can Company, Inc. The complaint alleged that both this employer and the certified representative of the employees, United Papermakers and .Paperworkers, AFL–CIO, had engaged in discriminatory activity in violation of § 8(a) (1), (2) and (3), and § 8(b) (1) (A) and (2) of the National Labor Relations Act, 29 U.S.C.A. §§ 158(a) and (b). The trial examiner found that the charges of discrimination had been sustained by the evidence adduced at the hearing before him. A three member panel of the Board, see 29 U.S.C.A. § 153(b), adopted his findings of fact but, one member dissenting, concluded that the discharges were not unlawfully motivated. 136 N.L.R.B. 1135 (1962).

Greco was employed at a recently opened plant of Continental Can in Carteret, New Jersey. David Roggenkemper was the manager of this plant. Following an election of the employees on April 20, 1960, the papermaker union became the certified bargaining representative of these employees, and Local 790 was chartered to represent them. George Pescatore was the vice president and regional director for the union in this area, and James Russo was elected president of the local.

Negotiations between the company and the union for a new collective bargaining agreement commenced in June, 1960. Several meetings were held, but the major obstacle to an accord appeared to be a dispute over the basic hourly rate to be paid the employees; the union sought the rate paid at another of the company's plants, $1.91 per hour, while the company offered $1.81 per hour at a meeting on July 13. On July 16 the union membership held a meeting to consider the company's last offer and voted to strike the plant on July 25 unless the company in-creased its offer to $1.91 per hour. However, Pescatore directed Russo to call a special meeting on company premises for July 22 to consider an increase in the company's proposal to $1.86 per hour. Russo and several members of the union vehemently protested the calling of this meeting in view of the previous strike vote of the membership. At this meeting Pescatore's authority was challenged, a disturbance arose, Pescatore left the meeting, and, on his information, several union members were fired by Roggenkemper.

As we have previously indicated, the trial examiner concluded that the discharges were discriminatorily motivated, and his evidentiary findings were adopted in toto by the Board. Nevertheless, the Board concluded that the employees were discharged for fighting. The petitioner contends that this determination constitutes an unwarranted reversal of the trial examiner on a question of fact, while the Board asserts that it merely drew a different inference or conclusion from the evidence adduced at the hearing.

We agree with the Board that its difference with the trial examiner concerned the ultimate conclusion to be inferred from the evidence. We further agree that this is within the province of the Board, provided that the inference it seeks to draw is such as *"reasonably may be based upon the facts proven."* (Emphasis supplied.) Republic Aviation Corp. v. National Labor Relations Board, 324 U.S. 793, 800, 65 S.Ct. 982, 986, 89 L.Ed. 1372 (1945). Accord: Radio Officers' Union, etc. v. National Labor Relations Board, 347 U.S. 17, 48–52, 74 S.Ct. 323, 98 L.Ed. 455 (1954); International Union of Electrical, Radio and Machine Workers v. National Labor Relations Board, 273 F.2d 243, 247 (C.A.3, 1959). The conclusion of the Board thus must be a reasonable and logical deduction from the evidence.

We turn then to an application of that standard to the findings of fact adopted by the Board as to the circumstances attending the discharges. These findings are based upon substantial evidence and,

as printed in the Joint Appendix of the parties, comprise fifteen pages of the trial examiner's Intermediate Report. Because they are of critical significance on the question of motivation for the discharges, we quote the following portion of them:

"There is no doubt Pescatore was working closely with the Company before and throughout the operations of the Carteret plant. Thus, when Russo refused to call a meeting for July 22, for the purpose of taking a second strike vote on the Company's last offer, Pescatore, having already made arrangements with Roggenkemper for use of the cafeteria, promptly ordered Russo hold [sic] a meeting that afternoon. Shortly before the meeting, Pescatore spoke to Russo and after questioning his ability to control the membership, Pescatore declared he would show him how to handle 'these bums.' In this spirit, Pescatore went to the meeting and proceeded to demonstrate his ability to control the membership. Pescatore, as detailed above, in unmistakable language told the members they were going to vote and vote his way, to accept the last offer, under threat of his revoking the strike sanction, and with the additional warning that if they went on strike the Company would shut down the plant. It is undisputed that Mickey Greco and his group vigorously and loudly protested Pescatore's manner of conducting the meeting and his insistence that they vote and vote to accept the last offer. Again, there is no doubt commotion and bedlam immediately followed Pescatore's announcement that the men start voting. The disorder, it strikes me, began when Jakovenko, who resented Pescatore's attitude and went berserk, rushed toward Pescatore in a threatening manner and had to be restrained by a number of men. I am also firmly convinced Pescatore's actions precipitated the whole affair. Certainly,

his derogatory remarks about the membership, his conduct at the meeting, and his forthwith suspension of the local and its officers in plain violation of the International constitution, convinces me he dealt with the membership in high-handed, arbitrary, and dictatorial fashion and made it abundantly clear he would tolerate no opposition from the membership. * * *

"Within 10 or 15 minutes after the commotion began, seven of the employees were discharged by Roggenkemper. The discriminatees asserted Roggenkemper gave no reason for their discharges other than he had been ordered to fire them. On the contrary, Roggenkemper claimed Pescatore reported Mickey Greco and his gang were fighting, so he fired the men for that reason. Pescatore conceded none of the discriminatees, except Boguszewski and Jakovenko, engaged in any fighting and while he told Roggenkemper some 'punks' were screaming, he was not certain whether he stated Mickey Greco's gang, as distinguished from Greco, participated in the fighting. The testimony of Russo, Clifford Williams, and Miller, which I credit, fully supports the testimony of the seven discriminatees as to the reason given by Roggenkemper for their discharge. I, therefore, find that Pescatore requested the discharge of the seven men because of their opposition to him at the meeting and that Roggenkemper complied with request. I also find Rowe's discharge later that day was for the same reason. There is, of course, no question but the men, while attending the union meeting, were engaged in protected concerted activities.

"Moreover, and apart from the foregoing credibility findings, the evidence shows that the men were discharged because of their opposition to Pescatore's demand that they accept the Company's last offer, not

for violation of any company rule or policy against fighting on company property, as urged by Roggenkemper. First, the only evidence indicating the existence of such a rule or policy is Roggenkemper's cavalier statement that it has always been the policy of the Company to immediately discharge an employee for fighting on company premises. Secondly, there is no evidence or even contention that such a rule or policy was ever posted at the plant or that the employees were ever informed of such a policy or rule. Certainly, the Company cannot justify its dismissal of employees for violation of a rule which was neither publicized nor made known to the employees. But assuming the Company had a valid no-fighting rule, still it would not constitute a defense in this case. Here the alleged fighting occurred in the company cafeteria in the course of a union meeting, not while the men were performing their normal work duties. Manifestly, the no-fighting rule would have been inapplicable and ineffective had the meeting been held outside company premises, and I cannot distinguish that situation from the present one. It does not follow that by permitting the Union to hold a meeting on its premises that employee-members were still subject to the Company's normal plant rules, the same as if they were working. Surely, it would be ridiculous to say that a rule prohibiting loud or excessive talking by employees would apply while the men were attending a union meeting. Indeed, Roggenkemper recognized that the union meeting had no connection whatever with plant business for he specifically placed the cafeteria out-of-bounds to all supervisory and office personnel while the meeting was in progress. Accordingly, I find and conclude the employees were not subject to normal plant working rules while attending the union meeting.

"Further, the manner in which Roggenkemper carried out the discharges negates the idea he fired the men for violation of the no-fighting rule. Admittedly, he summarily fired the men without any investigation as to whether a fight had occurred and whether the dischargees had even participated in any fighting. Again, there is no claim the employees caused any property damage and Roggenkemper made no inquiry along that line either before or after he discharged the employees. Instead, Roggenkemper quickly accepted Pescatore's somewhat garbled complaint that the meeting was disorderly and hastily identified the dischargees through Pescatore and anyone who happened to be in the crowd. The means thus used to identify the men for discharge are certainly flimsy and unreliable and entitled to no weight, insofar as lending support to the charge that the dischargees actually engaged in fighting. I find it incredible and unbelievable that Roggenkemper, with 25 years' experience with the Company, would discharge employees under the circumstances related by him.

"Again, the postdischarge conduct of the Union and the Company fully supports the finding that the dischargees were discriminatorily dismissed. Thus, shortly after the discharges had been accomplished Russo and Miller met Pescatore and inquired when the discriminatees might return to work and he responded they would never come back as long as he was regional director. Pescatore denied having an [sic] conversation on this subject, but, for the reasons already stated, I accept the testimony of Russo and Miller and find Pescatore made the statement attributed to him.

"As set forth above, the Union committee met with Roggenkemper on July 27 in an effort to settle the work stoppage. It is undisputed Roggenkemper agreed that all the employees could return to work, except the dischargees. Russo, Genz, and Mesuk uniformly testified that Campbell asked why the men had been discharged and Roggenkemper replied it was for fighting on company property. Since no plant officials were present at the meeting, Campbell pressed Roggenkemper as to how he obtained the names of the men supposedly involved in the fight and Roggenkemper said he obtained the names from Pescatore. Russo and Genz quoted Roggenkemper as saying Pescatore had ordered him to fire these men. However, Mesuk could not remember if Roggenkemper made a statement to that effect. I can see no reason why Russo, Genz, and Mesuk would manufacture such a story, so I accept and credit their testimony.

"Considering all the evidence I have no difficulty in finding the discriminatees were unlawfully discharged as alleged in the complaint and the Company's contention that it terminated the employees for violation of a no-fighting rule is purely pretextuous." 136 N.L.R.B. 1150–1151.

In our view, these findings clearly preclude any inference that the employees were discharged for fighting. On the contrary, the mere recitation of them compels only one conclusion, that the discharges were discriminatorily motivated. Of course, the trial examiner acknowledged that a disturbance arose during the course of the union meeting. But his evidentiary findings, particularly those on credibility and the events attending the discharges, negate any inference that this disturbance was the reason for the company's action. Accordingly, since the Board expressly adopted the evidentiary findings of the examiner, its conclusion cannot stand.

We wish to emphasize that we do not question the power of the Board to make an independent evaluation of the evidence, to make its own findings based upon substantial evidence, and to draw a conclusion different from that of its trial examiner based upon that evaluation. Whether the record in the case at bar would support findings from which it could reasonably be inferred that the employees were discharged for fighting is a question we need not and do not now decide.[1] We hold only that the findings of fact adopted by the Board simply do not support the conclusion which it seeks to infer.

Because of our disposition, we find it unnecessary to consider the legal significance, if any, of the fact that the discharges resulted from activities occurring during the course of a union meeting. Further, we have examined the union's contention that the petitioner unduly delayed seeking review of the order of the Board, but find it to be without merit.

The cause will be remanded to the Board for further proceedings in conformity with this opinion.

---

1. Of course, since motivation is largely a question of intent, it is primarily an issue of fact. United States v. Minker, 312 F.2d 632, 634 (C.A.3, 1962), cert. denied, 372 U.S. 953, 83 S.Ct. 952, 9 L. Ed.2d 978 (1963); Schauffler, etc. v. United Association of Journeymen & Apprentices, 230 F.2d 572, 576 (C.A.3), cert. denied, 352 U.S. 825, 77 S.Ct. 34, 1 L.Ed.2d 48 (1956).