**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**JOHNNIE'S POULTRY CO., and John Bishop Poultry Co., Successor, Respondent.**

**No. 17843.**

United States Court of Appeals Eighth Circuit.

April 29, 1965.

Laurence Gold, Atty., N.L.R.B., Washington, D. C., made argument for petitioner. Arnold Ordman, Gen. Counsel, N.L.R.B., Washington, D. C., Dominick L. Manoli, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Elliott Moore and Vivian Asplund, Attys., N.L.R.B., Washington, D. C., were on the brief.

Paul S. Kuelthau of Moller, Talent & Kuelthau, St. Louis, Mo., made argument for respondent and filed brief with Glenn L. Moller of Moller, Talent & Kuelthau, St. Louis, Mo.

Before VAN OOSTERHOUT and BLACKMUN, Circuit Judges, and YOUNG, District Judge.

VAN OOSTERHOUT, Circuit Judge.

This case is before the court upon petition of the National Labor Relations Board pursuant to § 10(e) of the National Labor Relations Act as amended (29 U.S.C.A. § 151 et seq.), hereinafter referred to as the Act, for the enforcement of its order issued against respondent employer Johnnie's Poultry Co. on April 13, 1964, reported at 146 N.L.R.B. No. 98. This court has jurisdiction, the alleged unfair labor practices having occurred in Perryville, Missouri, within this circuit. The jurisdictional facts as determined by the Board are established.

The facts are set out in the trial examiner's intermediate report and the Board's decision. No purpose will be served in setting out the facts in detail here. This litigation arises out of the efforts of the District Union 99, Amalgamated Meat Cutters & Butcher Workmen of North America, AFL-CIO, hereinafter called the Union, to organize the employees of Johnnie's Poultry Co., of which John Bishop was the principal officer. On October 27, 1961, the Union lost a Board-conducted consent election by a vote of 41 to 27 after the Union had succeeded in obtaining some 55 authorization cards. The Union renewed its organizational activities on September 20, 1962. On December 6, 1962 the Union sent a letter to the employer enclosing photostats of 49 authorization cards signed by employees and requested recognition as the bargaining representative of "your employees". The payroll of the employer showed 98 employees. The Board ultimately determined that the appropriate unit consisted of 93 members.

On December 10, 1962, the employer responded to the Union's request, stating, "we do not regard the copies of cards which you sent us as a reliable indication of the present desires of our employees. * * *" The employer expressed a will-

ingness to cooperate in expediting the election.

The Union filed charges and amendments thereto against the employer which resulted in a complaint filed by the Regional Director. After hearing, the Trial Examiner made extensive findings and concluded that the employer was not guilty of the unfair labor practices charged and he recommended the dismissal of the complaint. Upon review, the Board, overruling the Examiner, found that the employer had violated § 8(a)(1) of the Act by coercively interrogating employees as to protected activities, threatening to close part of the plant if unionized, and promising benefits for voting against the Union. The Board, with one member dissenting, in disagreement with the Trial Examiner, determined that upon receipt of the authorization cards the employer did not in good faith doubt the Union's majority status and hence, the employer violated § 8(a)(5) and (1) of the Act by refusing to recognize and bargain with the Union.

The Board urges that substantial evidence on the record as a whole supports its findings and inferences that the employer was guilty of the violations found by the Board as above set out and that it is entitled to the enforcement of its order. The employer insists that there is no substantial evidence to support the Board's order, particularly in the light of the contrary findings by the Trial Examiner who heard and observed the witnesses.

Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456, teaches that the findings of the Board must be supported by substantial evidence on the record as a whole, that the findings of the Trial Examiner are part of the record, and that evidence supporting a conclusion may be less substantial when an experienced examiner, who has seen and heard the witnesses, reaches a conclusion contrary to that reached by the Board, and that this is particularly true where the credibility of witnesses is involved. See N.L.R.B. v. Blades Mfg. Corp., 8 Cir., 344 F.2d 998; (May 10, 1965) Greco v. N.L.R.B., 3 Cir., 331 F.2d

165; N.L.R.B. v. Porter County Farm Bureau Co-op. Ass'n, Inc., 7 Cir., 314 F.2d 133, 144.

The Board asserts no credibility findings are here involved. We disagree. The Examiner credited the testimony of the attorneys who took the employees' statements as being more accurate than that of the employees. The Examiner also heard Mr. Bishop's testimony setting out the reasons why the employer did not accept the cards as proof of Union majority and thus was in a favorable position to judge his sincerity and good faith. Moreover, the Board uses the finding of coercion as a factor in making its finding of lack of good faith in refusing to bargain.

The Board, in support of its coercion order, relies upon the Haynes incident and the interrogation of employees by the employer's attorneys. The Examiner thus summarizes the Haynes incident:

"Haynes, whose wife also worked for the Company, stated that in the last week of August, he asked John Bishop for a loan of $50 and Bishop told him to. come to the office the next day, Saturday, which he did. Bishop, after making the loan, said the Union would try to organize the plant but he could not afford to pay union wages and would shut down rather than have the Union in the plant. Bishop remarked he had helped Haynes and his wife by giving them jobs and lending them money and, if the Union tried to get in the plant, 'you know how to vote.' Haynes said, 'we'd see,' and, apparently, that ended the conversation. Admittedly, there were no organizational activities at the plant at that time."

\* \* \* \* \* \*

"I question whether Bishop's statement to shut down the plant was coercive since it was predicated upon his inability to meet the union wage scale. In any event, the Union was not engaging in organizational activities at that time, so I cannot see how this conversation has any evidentiary value in determining the

Company's position towards organization when it commenced a month or so later."

At most, the challenged statement is an isolated incident made in a friendly conversation more than a month before the organizational campaign commenced. We have denied enforcement in similar situations. See N.L.R.B. v. Council Mfg. Corp., 8 Cir., 334 F.2d 161, 165, and cases there cited.

With respect to the interviewing of employees, we have examined the record, the Examiner's report and the Board's decision, and without detailed discussion, we state that we are of the view that the Board's determination on this issue is not supported by substantial evidence. The facts are adequately set out in the Examiner's report which resulted in his conclusion, reading: "On all the evidence I find the interviews were confined to matters well within the scope of the amended charge and the complaint and were neither illegal nor coercive."

We now turn to the § 8(a)(5) and (1) charge relating to the employer's refusal to recognize and bargain with the Union. The primary issue presented is whether the employer had a good faith doubt that the Union represented a majority of its employees. We have held that election and certification proceedings are not the only method of determining majority representation and that an employer is under duty to bargain as soon as the Union representatives present convincing proof of majority support. N.L.R.B. v. Decker, 8 Cir., 296 F.2d 338, 341. We there reaffirmed the rule stated in N.L.R.B. v. Wheeling Pipe Line, Inc., 8 Cir., 229 F.2d 391, 393, reading:

" 'There is no absolute right vested in an employer to demand an election. IOB v. Los Angeles Brewing Co. (supra) [9 Cir., 183 F.2d 398]. If an employer in good faith doubts the union's majority, he may, without violating the Act, refuse to recognize the union until its claim is established by a Board election. A doubt professed by an employer as to the union's majority claim must

be genuine. Otherwise the employer has a duty to bargain and may not insist upon an election.' "

In N.L.R.B. v. Dan River Mills, Inc., 5 Cir., 274 F.2d 381, the unit consisted of 332 employees of which 167 constituted a majority. One hundred and eighty-eight cards were presented, some of which were challenged. The Board ultimately came up with the determination that 167 of the cards were valid, after rejecting some cards. The court discusses quite fully the issue of the employers' good faith in refusing to accept the cards and factors entering into such determination and refuses to enforce the failure to bargain charge, stating:

"Substituting partisan determination of controversies through the means of volcanic pressures of an industrial conflict for that of impartial disinterested governmental machinery ought not to be encouraged.

"Under the special circumstances of this case, it was reasonable for the Employer to assume that the law would resolve its good faith doubt concerning the Union's majority by the election requested and shortly ordered. The subsequent dismissal of those proceedings with the filing of the unfair labor complaint cannot deprive its interim actions of that cloak of reasonableness and good faith doubt. The order as to § 8(a)(5) may not, therefore, stand." 274 F.2d 381, 389.

Other cases holding the employer acted in a good faith belief that the Union lacked majority representation include Fort Smith Broadcasting Co. v. N.L.R.B., 8 Cir., 341 F.2d 874; N.L.R.B. v. Bedford-Nugent Corp., 7 Cir., 317 F.2d 861; N.L.R.B. v. Porter County Farm Bureau Co-op. Ass'n, Inc., supra.

The Examiner in his report points out that there were 98 employees on the payroll at the time of the recognition request; that while the Union requested recognition as the bargaining agent of "your employees", no attempt was made to exclude employees from the unit prior

to the hearing. He observes that cards of 49 of the 98 employees do not represent a majority of the employees. At the hearing, the General Counsel for the first time urged that 5 college students on the payroll were temporary employees and were not part of the unit. The Board excluded the students from the unit, leaving a unit of 93 employees. The Examiner determined that the General Counsel had failed to establish an appropriate unit in connection with the request to bargain, but then went on to say that assuming an appropriate unit was established, the employer was not obligated to accept the 49 union cards as conclusive proof of the union representation of a majority of the 93 employees in the unit. He calls attention to the fact that the employer promptly petitioned for an election, and the fact that the Union had failed to establish its earlier claim to representation in the 1961 election when it had cards of a much larger percentage of the employees. The Examiner further observes, "Nor is there any evidence remotely suggesting the Company's request for an election was prompted by hostility to unionization of its employees, or opposition to bargaining with the Union, or to gain time within which to dissipate the Union's majority status." He concludes his findings by stating:

"Considering the course of action followed by the Company, plus the absence of any evidence indicating unlawful conduct on the part of the Company, or its rejection of the collective-bargaining principle, I am convinced the Company's refusal to bargain with the Union was motivated by its good-faith doubt concerning its majority status."

The Board's reversal of the Examiner upon the good-faith issue appears to be based largely upon the results of the interviews with some 40 of the employees some 17 days after the employer's initial refusal to recognize the Union and at a time subsequent to being advised of the likelihood of the filing of this complaint. The interviews conducted by the company's attorneys established that the employees questioned signed the cards. Some stated that they were told that initiation fees would be waived. Mr. Bishop testified that at least three employees not included in the group of cards presented had told him that they signed the cards on the belief that they were only requesting an election. We do not believe that the information obtained in the interviews was such as to support the inference drawn by the Board that the employer's prior good-faith doubt about majority status was thereby converted into bad faith. While all signing employees who were at the plant on the day of the interviews were questioned, the interviews covered only 40 of the card signers. In the 1961 election, 55 employees had signed cards but only 21 employees supported the Union at the Board-conducted election. Board Chairman McColloch, in an address before the Labor Relations Section of the American Bar Association in 1962, stated:

"In 58 elections, the unions presented authorization cards from 30 to 50% of the employees; and they won 11 or 19% of them. In 87 elections, the unions presented authorization cards from 50 to 70% of the employees; and they won 42 to 52% of them. In 57 elections, the unions presented authorization cards from over 70% of the employees, and they won 42 or 74% of them." 1962 proceedings, Section of Labor Relations Law, American Bar Association, pp. 14, 17.

Such report shows that what happened in the 1961 election is not without substantial precedent.

The Union did obtain from some employees a signed authorization to use the cards in support of the Union's demand for recognition. However, such document was not presented to the company and was first produced at the trial. The interviews of the employees disclosed that some had signed a paper but the evidence is very indefinite as to what was actually signed. Some employees stated they had merely signed a blank paper. No reliance can be placed upon a document which

has not been brought to the employer's attention.

Upon the face of the record here, we find no substantial evidentiary basis for the Board to draw a reasonable inference that the employer did not act in good faith in refusing to recognize the Union and bargain with it.

What we have heretofore said is dispositive of this case and hence we find it unnecessary to consider the troublesome question of the circumstances under which the waiver of initiation fees by a Union as an inducement to obtain signatures to authorization cards may be coercive so as to destroy the validity of the cards for representation purposes. On this issue, see N.L.R.B. v. Gorbea, Perez & Morell, 1 Cir., 300 F.2d 886; 328 F.2d 679; N.L.R.B. v. Gilmore Industries, Inc., 6 Cir., 341 F.2d 240. The Examiner did not base his determination upon this issue. The evidence is unclear as to just what representations were made relating to initiation fees. The resolution of such issue, here unnecessary, will be pretermitted.

The petition for enforcement is denied.