331 F.2d 720
 The PHILIP CAREY MANUFACTURING COMPANY, MIAMI CABINET DIVISION, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA, UAW-AFL-CIO, and Its Local Union No. 689, Petitioners,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
 No. 15289.
 No. 15330.
 United States Court of Appeals Sixth Circuit.
 March 31, 1964.
 
 COPYRIGHT MATERIAL OMITTED J. Mack Swigert, Cincinnati, Ohio, Frank H. Stewart, Cincinnati, Ohio, on brief; E. J. Fasold, Cincinnati, Ohio, of counsel, for Philip Carey Mfg. Co.
 Lowell Goerlich, Washington, D. C., for International Union, etc.
 William J. Avrutis, Washington, D. C., Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, Allison W. Brown, Jr., Attorney, N. L. R. B., Washington, D. C., on brief, for N. L. R. B.
 Before O'SULLIVAN, Acting Chief Judge, PHILLIPS, Circuit Judge, and MAGRUDER, Senior Circuit Judge.*
 PHILLIPS, Circuit Judge.
 
 
 1
 This is a vigorously contested labor case, involving a number of issues.
 
 
 2
 The parties are the Philip Carey Manufacturing Company, hereinafter called the Company, and the United Automobile, Aerospace and Agricultural Implement Workers of America, UAW-AFL-CIO, and its local union No. 689, hereinafter referred to as the Union. The case is before this Court on petitions for review filed by both the Company and the charging Union, and on the cross-petition of the National Labor Relations Board for enforcement of its order. The decision and order of the Board are reported at 140 N.L.R.B. No. 90, p. 1103.
 
 
 3
 The circumstances giving rise to this controversy, in summary, are as follows: Early in 1960 the Union began its campaign to organize the Company's Middletown, Ohio, plant. An election was held on March 9 resulting in 122 votes for the Union, 106 votes for Miami Cabinet Independent Union, and six votes for no union. On March 17 the Union was duly certified.
 
 
 4
 Negotiations for a contract began on April 18, 1960. The Union submitted a proposed contract on May 16 and agreement was reached eventually on a number of issues, including grievance and arbitration procedures. On July 28 the parties met for the eleventh time, and the Company submitted a proposed complete contract. This proposal incorporated all provisions agreed upon at the ten previous negotiation meetings and contained a number of improvements over existing benefits. The estimated total value of the general increase and monetary fringe benefits was nine cents per hour apart from incidental pay increases resulting from abolition of rate ranges. The Board found the Company offer of July 28 to be an economic package slightly greater than that offered by the Company in any of its other organized plants.[1]
 
 
 5
 The Union rejected the Company's offer because it revised past practices with respect to accumulation of seniority during lay offs and rates to be paid during temporary transfers to avoid lay off.[2]
 
 
 6
 Between July 28, when the Company's proposal was made, and September 6, the parties had eleven more meetings. On September 6 the employees voted to go out on strike, and the strike began at midnight.
 
 
 7
 On September 26 the Company wrote a letter to the Union renewing its proposal, with the exception of a check-off provision, and stating that if the offer was not accepted by September 30, the Company would modify its seniority proposal so as to give "special seniority rights" for layoff and recall purposes to nonstrikers and to employees replacing strikers. The Company also stated in this letter that it would be necessary to commence the hiring of permanent replacements, but that strikers who reported for work by October 3 would be reemployed. Copies of this letter were sent to all employees. By "special seniority," the Company meant that, for layoff and recall purposes only, the seniority of any employee would accrue from the first day he worked after the strike began.[3]
 
 
 8
 The parties met on September 29, but without affirmative result. They met again on October 7, and the Company presented its written proposal for "special seniority" and said that, absent agreement, this would become a part of its contract offer.
 
 
 9
 The Company began hiring replacements on October 12. After meeting on October 29 the parties next met on November 22, when the Union presented some new proposals. This meeting continued the following day, November 23, and there is conflicting testimony as to exactly what occurred. From a synthesis of the testimony, the Trial Examiner found that the two significant issues had become the Company's insistence on its superseniority[4] proposal and the Union's insistence on reinstatement of all strikers.
 
 
 10
 The parties next met on December 28, when the Union said that it could not recognize the replacements in the plant. The Company contends that the issue of superseniority was not discussed at this meeting, though a union representative testified that there was no change in the Company's position on superseniority. After this meeting the parties recessed, subject to further call by the Mediation Service. There were no further meetings until August 23, 1961.
 
 
 11
 Meanwhile, the Company continued its restaffing program, which was virtually completed by February 1, 1961.
 
 
 12
 On August 3, 1961, the Union sent the Company, on behalf of 122 named strikers, unconditional offers to return to work. The Company replied, on August 9, 1961, that fifteen of the named employees had been rehired, that ten of the strikers had been denied reinstatement because of strike misconduct, and that the rest had been denied reinstatement because they had been permanently replaced.
 
 
 13
 On August 10, 1961, the Company wrote to the Union that it was withdrawing its superseniority proposal. This letter came on the heels of the Board's decision in Erie Resistor Corp., 132 N.L. R.B. 621, the import of which will be discussed hereinafter.
 
 
 14
 The Union construed this letter to mean that the Company was also withdrawing from its position that replaced strikers had no reinstatement rights. The Union wired the Company that it interpreted this letter to mean that the Company would rehire all the strikers who had applied for reinstatement, and give notification that they would report for work on August 14. The Union also suggested a meeting on August 14, stating that "numerous problems are posed." This was the Union's first request for a meeting since December 28, 1960.
 
 
 15
 The Company promptly replied to the Union by wire, stating unequivocally that all strikers not yet rehired had been permanently replaced.
 
 
 16
 The parties met on August 23, 1961, and the Company explained that its letter of August 10 had meant only to withdraw the superseniority proposal, and nothing more.
 
 
 17
 The last meeting was held September 7, 1961. The Company offered a proposed contract at this meeting which embodied the July 28, 1960, proposal with two changes, and with the superseniority proposal omitted. The Union said that it could not accept the contract without reinstatement of the strikers. There were no further meetings.
 
 The following questions are presented:
 
 18
 (a) Was the strike an economic strike or an unfair labor practice strike at its inception? The Board held it to be an economic strike.
 
 
 19
 (b) Did the Company put into effect a program of superseniority in violation of §§ 8(a) (1) and 8(a) (3) of the Act, 29 U.S.C. § 158(a) (1) and (a) (3)? The Board answered in the negative.
 
 
 20
 (c) Did the Company insist upon a contractual provision for superseniority to the point of impasse in violation of § 8(a) (5), 29 U.S.C. § 158(a) (5) and, if so, as of what date? The Board answered in the affirmative, as of December 28, 1960.
 
 
 21
 (d) Did the insistence of the Company upon superseniority convert the strike into an unfair labor practice strike, and, if so, as of what date? The Board answered in the affirmative, as of December 28, 1960.
 
 
 22
 (e) Were twenty-eight unfair labor practice strikers entitled to reinstatement and back pay? The Board answered in the affirmative.
 
 
 23
 (f) Should interest be allowed on the back pay awards? The Board answered in the affirmative.
 
 
 24
 (g) Were the charges of unfair labor practices in question barred by the six-month limitation provisions of Section 10(b) of the Act, 29 U.S.C. § 160(b)? The Board answered in the negative.
 
 
 25
 (h) Did certain statements made by four supervisory personnel constitute coercive attempts on the part of the Company to induce employees to abandon the strike, in violation of Section 8(a) (1) of the Act, 29 U.S.C. § 158(a) (1)? The Board answered in the affirmative.
 
 
 26
 (i) Did the Trial Examiner properly exercise his discretion when he granted the General Counsel's motion to strike the names of four strikers from the amended complaint on the ground that they had engaged in misconduct which barred their reinstatement? The Board answered in the affirmative.
 
 
 27
 (j) Should the Company be required to continue to bargain with the Union under the circumstances of this case and despite the Union's loss of majority? The Board answered in the affirmative.
 
 
 28
 The Board's order requires the Company to cease and desist from the unfair labor practices found and from in any other manner interfering with, restraining or coercing its employees in the exercise of their statutory rights. Affirmatively the Board ordered the Company upon request to bargain with the Union in good faith; offer reinstatement to those reapplying strikers who were not replaced before December 28, 1960 and reimburse them for any loss of pay they may have suffered by reason of the discrimination against them, plus interest; and to post the customary notices. The Company contends that the Board's findings of unfair labor practices against it are unwarranted and that the order should not be enforced. The Union asserts that various findings are erroneous and that the Board should have found additional violations and should have directed reinstatement of all replaced strikers.
 
 
 29
 We grant enforcement in part and deny enforcement in part.
 
 
 30
 (a) The Trial Examiner found that the Company's proposed contract of July 28 constituted an ultimate offer, and thereafter created a bargaining vacuum; that this constituted a refusal to bargain in good faith in violation of Section 8(a) (5) of the Act, 29 U.S.C. § 158(a) (5), which contributed to the strike of September 6; and that the strike was therefore an unfair labor practice strike from the beginning.
 
 
 31
 With these findings the Board disagreed. It stressed the fact that the July 28 offer came at the eleventh meeting of the parties, and observed that "there comes a point in any negotiation where the positions of the parties are set and beyond which they will not go." The Board concluded that the Company continued to bargain in good faith after the July 28 offer, and therefore the strike was an economic strike at its inception. The Union would have this Court find, as did the Trial Examiner, that the proposed contract submitted by the Company on July 28, 1960, constituted an ultimatum, created a bargaining vacuum, and rendered ensuing negotiations bad faith bargaining, thereby contributing to the strike of September 6, 1960.
 
 
 32
 We find that the holding of the Board on this question is supported by substantial evidence on the record and that the holding of the Trial Examiner was erroneous. As the Board pointed out, July 28 was the eleventh meeting between the parties and the Company was entitled to take a definite position at that time. The proposed contract contained a number of improvements over existing benefits and was the biggest economic package offered by the Company at any of its seven other plants in the United States, as set forth above in more detail. Furthermore there were eleven more meetings between July 28 and the date of the strike.
 
 
 33
 We therefore approve the holding of the Board that the Company did not exceed the limits of permissible bargaining by adhering substantially to its July 28 proposal and that the Company continued to bargain in good faith from July 28 to the time of the strike on September 6. From this conclusion it necessarily follows, as found by the Board, that the strike was an economic strike in its inception.
 
 
 34
 It is established law that if an employee is replaced while on an economic strike, he is not entitled to reinstatement as a matter of right. So long as the strike retained the status of an economic strike, the Company had a right to employ replacements and was not required to reinstate replaced striking employees upon their election to return to work. N. L. R. B. v. Mackay Radio & Telegraph Co., 304 U.S. 333, 58 S.Ct. 904, 82 L.Ed. 1381.
 
 
 35
 (b) The Union contends that the Company put into effect a system of superseniority during the strike and that the Company thereby violated Section 8(a) (3) of the Act, 29 U.S.C. § 158 (a) (3), relying upon N. L. R. B. v. Erie Resistor Corp., 373 U.S. 221, 83 S.Ct. 1139, 10 L.Ed.2d 308, and Swarco, Inc. v. N. L. R. B., 303 F.2d 668 (C.A.6). Both the Trial Examiner and the Board found that superseniority was never placed in effect. While the testimony is conflicting on this point, we find substantial evidence on the record to support this holding of the Board. The record shows that company representatives denied that superseniority was put into effect; there were no changes in the Company's seniority lists; in interviewing replacements the Company did not discuss superseniority and gave no assurance of superseniority to job applicants; and no Company advertisements for job applicants during the strike made any reference to superseniority. In finding that the Company never put superseniority into effect, the Board performed its function "to reconcile the conflicting testimony and to determine the credit or weight to be attached to the testimony of the various witnesses." N. L. R. B. v. Sawyer Downtown Motors, 213 F.2d 514, 515 (C.A.7); N. L. R. B. v. Aurora City Lines, Inc., 299 F.2d 229, 232 (C.A.7). Therefore, the Board's findings on this issue, which are supported by substantial evidence, will not be disturbed. Old King Cole, Inc. v. N. L. R. B., 250 F.2d 791, 792 (C.A.6); Raser Tanning Co. v. N. L. R. B., 276 F.2d 80, 84 (C.A.6), cert. denied, 363 U.S. 830, 80 S.Ct. 1601, 4 L.Ed.2d 1524.
 
 
 36
 (c) We now come to the most difficult question in the case, and one which will be determinative of some of the other issues. This is the question of the Company's superseniority proposal and its effect upon the strike. The Board, as set out above, found that the Company's insistence on this proposal converted the strike into an unfair labor practice strike on December 28. The Union argues that insistence on superseniority converted the strike prior to this time, and the Company contends that the strike was never converted from its status as an economic strike.
 
 
 37
 Before turning to the question of the conversion of the strike, there should be some consideration of the legal significance of superseniority. The Company contends that the fact that superseniority was never placed in effect serves to distinguish this case from N. L. R. B. v. Erie Resistor Corp., 373 U.S. 221, 83 S.Ct. 1139, 10 L.Ed.2d 308; Swarco, Inc. v. N. L. R. B., 303 F.2d 668 (C.A.6); and Griffin Pipe Division of Griffin Wheel Co. v. N. L. R. B., 320 F.2d 656 (C.A.7). In those cases superseniority plans were found to be unlawful, but in each case the plan had been put into effect.
 
 
 38
 This does not mean, however, that superseniority must be put into effect in order to be unlawful. A careful delineation must be made of the issue here involved. The three above-cited cases stand for two separate propositions. To grant superseniority to replacements and returning strikers is discrimination in violation of § 8(a) (3) of the Act, 29 U.S.C. § 158(a) (3). N. L. R. B. v. Erie Resistor Corp., supra; Swarco, Inc. v. N. L. R. B., supra. To insist on a superseniority provision in the contract may constitute a refusal to bargain in violation of § 8(a) (5), 29 U.S.C. § 158(a) (5). N. L. R. B. v. Erie Resistor Corp., supra; Griffin Pipe Division of Griffin Wheel Co. v. N. L. R. B., supra. It is important that the distinction between the effects of enforcing and insisting upon superseniority be made clear. Thus, in the instant case, the Company never put into effect a superseniority plan and therefore did not, in this respect, violate § 8(a) (3). The question remains whether the Company so insisted on superseniority to a point of impasse that it constituted a refusal to bargain in violation of § 8(a) (5).
 
 
 39
 Before proceeding to the case at hand, some consideration should be given to the meaning of the word "insistence" in this context. The Union, apparently in the hope that insistence will be equated with mere advocacy, refers to the following quotation: "If the proposal is not a mandatory bargaining subject, insistence upon it was a per se violation of the duty to bargain." Industrial Union of Marine & Shipbuilding Workers v. N. L. R. B., 320 F.2d 615, 618 (C.A.3), citing N. L. R. B. v. Wooster Div. of Borg-Warner Corp., 356 U.S. 342, 78 S. Ct. 718, 2 L.Ed.2d 823, and N. L. R. B. v. Davison, 318 F.2d 550 (C.A.4). All of these cases use merely the word "insistence"; other cases would indicate that insistence, in this context, means insistence to the point of impasse. In International Longshoremen's Ass'n v. N. L. R. B., 107 U.S.App.D.C. 329, 277 F.2d 681, 683, it was said: "The union had a right to present, even repeatedly, a demand concerning a non-mandatory subject of bargaining, so long as it did not posit the matter as an ultimatum." (Emphasis added.) In the Erie Resistor case the Board said: "Respondent's continued insistence on this or a similar proposal, as a condition of negotiating an agreement with the Union, constituted a violation of § 8(a) (5)." 132 N.L.R.B. at 631. (Emphasis added.) Finally, the Trial Examiner in the instant case said: "While the meaning of `insist' as used in this context has not been precisely defined, it would seem to connote, at the very least, persisting in a proposal to the point of impasse, notwithstanding objection thereto by the other party to the bargaining."
 
 
 40
 Now, with this background in mind, we turn to the case at hand to determine whether, and at what point, the Company insisted on superseniority to a point of impasse.
 
 
 41
 The Company's superseniority proposal was first made in its letter of September 26. The Board found that the Company insisted on the inclusion of this provision in any contract it might sign, and that this insistence caused the bargaining negotiations to reach an impasse on December 28. The Board noted that after that date there were no further meetings until the Company withdrew its superseniority proposal. The Board concluded that the Company's insistence on its proposal contributed materially to the prolongation of the strike after December 28, and that on that date the strike was converted from an economic strike to an unfair labor practice strike. Here it might be noted that Board Member Brown was of the opinion that the letter of September 26 constituted a threat to institute superseniority in violation of § 8(a) (1), 29 U.S.C. § 158(a) (1), and that on this date the strike was converted to an unfair labor practice strike.
 
 
 42
 The Union contends that the strike was an unfair labor practice strike from its inception on September 6, but, in the alternative, that it was converted into an unfair labor practice strike well before December 28. There are several dates which the Union asserts as earlier alternatives to December 28.
 
 
 43
 There can be no doubt that the Union opposed vigorously the superseniority proposal and that it immediately became a major obstacle in negotiations.
 
 
 44
 The Union urges that this Court adopt the view of Board Member Brown to the effect that the Company's letter of September 26, which said that the Company would make superseniority a part of its proposed contract, constituted a violation of § 8(a) (1), in that it threatened to institute superseniority and thereby coerced the strikers; and that therefore the strike was converted into an unfair labor practice strike on that date. The Board held that this letter did not convert the strike, and thus it was not necessary to decide whether the letter constituted an independent violation of § 8 (a) (1).
 
 
 45
 The letter of September 26 said simply that, unless agreement was reached, the Company would make superseniority a part of its proposed contract. This did not mean necessarily that the Company was putting superseniority into effect, in violation of § 8(a) (3), and we find that this letter, in and of itself, did not cause the negotiations to reach an impasse, in violation of § 8(a) (5).
 
 
 46
 The Union next contends that the strike was converted into an unfair labor practice strike as of October 7. At a meeting of the parties on that date the Company presented its written superseniority proposal and made it a part of its proposed contract. The Union says that by making superseniority a part of its proposal the Company insisted upon it to a point of impasse in violation of § 8(a) (5).
 
 
 47
 Neither the Examiner nor the Board found that bargaining reached an impasse on October 7. There were further meetings in October and November, which tend to weigh against the contention that bargaining had reached an impasse at that time.
 
 
 48
 The Union next argues in the alternative that the Company insisted upon superseniority to the point of impasse at a meeting held October 19. The Trial Examiner and Board ruled to the contrary, and we find that this holding is supported by substantial evidence on the record.
 
 
 49
 The next important meeting, for our purposes, was held November 22-23. The Trial Examiner found that at this meeting disagreement was centered on two issues: the Company's superseniority proposal, and the Union's insistence that all strikers be reinstated; and that the other issues had become less significant.
 
 
 50
 Both the Examiner and the Board passed over the November meeting, and concluded that the Company's insistence on superseniority caused an impasse (and thus converted the strike into an unfair labor practice strike) at the next meeting, held on December 28.
 
 
 51
 The Company contends that it never insisted upon superseniority to the point of impasse, arguing that even if it had withdrawn its superseniority proposal at the November or December meetings, the Union's insistence upon reinstatement of all strikers would have remained a major obstacle to agreement. It is well established, however, that in order to reach an impasse in violation of Section 8(a) (5) it is not necessary that the Company's proposal be the sole cause for failure of agreement. N. L. R. B. v. Wooster Div. of Borg-Warner Corp., 356 U.S. 342, 78 S.Ct. 718, 2 L.Ed.2d 823; Industrial Union of Marine & Shipbuilding Workers v. N. L. R. B., 320 F.2d 615, 618 (C.A.3).
 
 
 52
 In support of its argument that the superseniority proposal did not prolong the strike, the Company points out that no agreement was reached when it withdrew its superseniority proposal in August 1961. We agree with the holding of the Trial Examiner and the Board that this argument is not conclusive in view of the change in situation as between November and December 1960, when only about one-third of the strikers had been replaced, and August 1961 when all strikers had been replaced.
 
 
 53
 We find substantial evidence on the record to the effect that the Company's representative took the adamant position at the meeting of November 23 that the Company would not sign a contract without superseniority, and that this position had not changed at the time of the next meeting on December 28.
 
 
 54
 As said by the Supreme Court in N. L. R. B. v. Erie Resistor Corp., supra: "[S]uper-seniority by its very terms operates to discriminate between strikers and non-strikers, both during and after a strike, and its destructive impact upon the strike and union activity cannot be doubted." 373 U.S. at 231, 83 S.Ct. at 1147, 10 L.Ed.2d 308.
 
 
 55
 The holding of the Board that the Company did, in fact, insist upon superseniority to the point of impasse in violation of § 8(a) (5), 29 U.S.C. § 158(a) (5), is supported by substantial evidence. The evidence might well be held to support a holding that the point of impasse was reached either on November 23 or December 28. In some respects the proof points more strongly to the former date, but, considering the record as a whole, we do not disturb the finding of the Trial Examiner and the Board that the point of impasse was reached on December 28. The choice of the later date over the former is supported by the very fact that another meeting was held in December, and the fact that on November 23 the Union made some new proposals, thereby indicating that it did not consider the negotiations to be at an impasse at that time, whereas no further meetings were held after December 28 until the Company had withdrawn its superseniority proposal approximately eight months later in August 1961.
 
 
 56
 The burden was on the Company to show that the strike would have continued even if it had withdrawn its proposal of superseniority. N. L. R. B. v. Wooster Division of Borg-Warner Corp., 236 F.2d 898, 907 (C.A.6), reversed in other respects, 356 U.S. 342, 78 S.Ct. 718, 2 L.Ed.2d 823.
 
 
 57
 (d) Accordingly we approve the holding of the Board that the strike was converted into an unfair labor practice strike as of December 28, 1960.
 
 
 58
 (e) The Board directed that the Company offer to twenty-eight employees who were replaced after the strike had been converted into an unfair labor practice strike on December 28, 1960, reinstatement to their former or substantially equivalent employment without loss of seniority or other rights and privileges, discharging if necessary any replacements hired on or after December 28, 1960; and that the Company make these employees whole for any loss of earnings they may have suffered by reason of discrimination against them, from the date of their unconditional application for reinstatement to the date of the Company's offer of reinstatement, less net earnings.
 
 
 59
 The Company was obligated to reinstate unfair labor practice striking employees upon their unconditional offers to return to work. Mastro Plastics Corp. v. N. L. R. B., 350 U.S. 270, 278, 76 S.Ct. 349, 100 L.Ed. 309; N. L. R. B. v. Deena Artware, Inc., 198 F.2d 645, 651-652 (C.A.6), cert. denied, 345 U.S. 906, 73 S.Ct. 644, 97 L.Ed. 1342; Webb Fuel Co. v. N. L. R. B., 308 F.2d 936, 937 (C.A.6).
 
 
 60
 We grant enforcement of this part of the order of the Board.
 
 
 61
 (f) The next question is whether the Board's direction that the Company pay interest at six per cent upon the awards of back pay is a valid exercise of the powers of the Board.
 
 
 62
 The statute[5] contains no express provision authorizing the Board to allow interest on back pay awards. For twenty-six years the Board adhered to a policy of not allowing interest on such awards. In 1962 this policy was changed by a three-to-two decision so as to allow interest. Isis Plumbing & Heating Co., 138 N.L.R.B. 716.
 
 
 63
 It is well established that the omission of a mention of interest in statutes which create obligations does not show necessarily a Congressional intent to deny interest. As said by the Supreme Court in Rodgers v. United States, 332 U.S. 371, 373, 68 S.Ct. 5, 7, 92 L. Ed. 3:
 
 
 64
 "[T]he failure to mention interest in statutes which create obligations has not been interpreted by this Court as manifesting an unequivocal congressional purpose that the obligation shall not bear interest. Billings v. United States, 232 U.S. 261, 284-288 [34 S.Ct. 421, 58 L.Ed.2d 596]. For in the absence of an unequivocal prohibition of interest on such obligations, this Court has fashioned rules which granted or denied interest on particular statutory obligations by an appraisal of the congressional purpose in imposing them and in the light of general principles deemed relevant by the Court. See, e. g., Royal Indemnity Co. v. United States, [313 U.S. 289, 61 S.Ct. 995, 85 L.Ed. 1361], supra; Board of Comm'rs of Jackson County in State of Kansas v. United States, 308 U.S. 343 [60 S.Ct. 285, 84 L.Ed. 313].
 
 
 65
 "As our prior cases show, a persuasive consideration in determining whether such obligations shall bear interest is the relative equities between the beneficiaries of the obligation and those upon whom it has been imposed. And this Court has generally weighed these relative equities in accordance with the historic judicial principle that one for whose financial advantage an obligation was assumed or imposed, and who has suffered actual money damages by another's breach of that obligation, should be fairly compensated for the loss thereby sustained. See, e. g., Brooklyn Savings Bank v. O'Neil [324 U.S. 697, 65 S.Ct. 895, 89 L.Ed. 1296], supra; United States v. North Carolina, 136 U.S. 211, 216 [10 S.Ct. 920, 922, 34 L.Ed. 336]; Funkhouser v. J. B. Preston Co., 290 U.S. 163, 168 [54 S.Ct. 134, 136, 78 L.Ed. 243]."
 
 
 66
 For example, interest awards were held proper, even though interest was not mentioned in the applicable statutes, where a veteran brought suit for loss of compensation suffered as a result of wrongful refusal to reemploy him under the Universal Military Training and Service Act, 50 U.S.C.App. § 459, Travis v. Schwartz Manufacturing Co., 216 F.2d 448 (C.A.7); and where a suit was brought on behalf of employees under the Walsh-Healey Act, 41 U.S.C. § 36, to recover underpayments by contractors. Mitchell v. Riegel Textile, Inc., 104 U.S.App.D.C. 139, 259 F.2d 954.
 
 
 67
 In United States v. United Drill & Tool Corp., 87 U.S.App.D.C. 236, 183 F.2d 998, 999, the court said:
 
 
 68
 "Statutory obligations may bear interest even though the statute makes no provision for it. Interest on such obligations is or is not payable depending upon the purpose of the statutory enactment and upon principles of equity. If the obligation is in the nature of a debt it is deemed interest-bearing, because the statutory purpose was to create a debtor-creditor relationship and in equity interest is allowed as a means of compensating a creditor for loss of use of his money."
 
 
 69
 It is recognized under our legal system that wage-earners are heavily dependent upon wages, which more often than not constitute the sole resource to purchase the necessities of life from day to day. For example, many states have enacted statutes regulating the time of payment of wages, 31 Am.Jur.Labor § 827, p. 995 et seq. The National Bankruptcy Act accords priority to wage claims. 11 U.S.C. § 104, sub. a (2). Many wage-earners who are deprived of their wages doubtlessly find it necessary to borrow money to sustain themselves and their families, paying rates of interest at six per cent or higher.
 
 
 70
 A back pay award creates a debtor-creditor relationship. Reserve Supply Corporation v. N. L. R. B., 317 F.2d 785, 789 (C.A.2); cf. Nathanson v. N. L. R. B., 344 U.S. 25, 73 S.Ct. 80, 97 L.Ed. 23.
 
 
 71
 It is true that the purpose of the Labor Act is remedial and not punitive. Republic Steel Corp. v. N. L. R. B., 311 U.S. 7, 10, 61 S.Ct. 77, 85 L.Ed. 6. The contention that an award of interest is violative of these principles was answered as follows in N. L. R. B. v. Globe Products Corp., 322 F.2d 694, 697 (C.A. 4):
 
 
 72
 "Underlying the long-accepted practice of awarding interest in debtor-creditor cases is the principle that to do so fully compensates the creditor for the loss of the use of his money. Under the Act, an award of back pay is treated as a debt, Nathanson v. N. L. R. B., 344 U.S. 25, 27-28, 73 S.Ct. 80, 97 L.Ed. 23 (1952), and where there has been delay it does not appear arbitrary for the Board to include interest. Such an allowance, which merely makes the employee whole, is in no sense punitive as against the employer."
 
 
 73
 When the Board issues a back pay order, it enforces public and not private rights. Amalgamated Utility Workers v. Consolidated Edison Co., 309 U.S. 261, 265, 269, 60 S.Ct. 561, 84 L. Ed. 738.
 
 
 74
 Under its broad discretionary powers "to take such affirmative action including reinstatement of employees with or without back pay" as will effectuate the purposes of the Act, the Board is authorized to effect "a restoration of the situation, as nearly as possible, to that which would have obtained but for the illegal discrimination," Phelps Dodge Corp. v. N. L. R. B., 313 U.S. 177, 194, 61 S.Ct. 845, 852, 85 L.Ed. 1271, and may make a substantial departure from its previous method of computing back pay, N. L. R. B. v. Seven-Up Bottling Co., 344 U.S. 344, 73 S.Ct. 287, 97 L.Ed. 377. We accordingly join the other Circuits which have passed upon this question in holding that the Board has the discretionary power to allow interest on back pay awards, which was exercised validly in this case. N. L. R. B. v. Central Illinois Public Service Company, 324 F.2d 916 (C.A.7); Revere Copper and Brass, Inc. v. N. L. R. B., 324 F.2d 132 (C.A.7); Marshfield Steel Co. v. N. L. R. B., 324 F.2d 333 (C.A.8); N. L. R. B. v. Globe Products Corp., 322 F.2d 694, 696-697 (C.A.4), supra; International Brotherhood of Operative Potters, AFL-CIO v. N. L. R. B., 116 U.S.App.D.C. 35, 320 F.2d 757; Reserve Supply Corp. v. N. L. R. B., 317 F.2d 785, 789 (C.A.2), supra.
 
 
 75
 Enforcement is granted as to this part of the order of the Board.
 
 
 76
 (g) The Company argues at some length that the order of the Board directing continued recognition of the Union and reinstatement of strikers is barred by the limitation in § 10(b) of the Act, 29 U.S.C. § 160(b), which provides in pertinent part, "That no complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board." Here the § 8(a) (5) violation, bargaining to an impasse, occurred on December 28, 1960. The first charge in this case was filed September 23, 1960; an amended charge was filed October 20; and a new charge filed December 7. On July 28, 1961, these were consolidated and a complaint issued. On September 12, 1961, an amended charge was filed, and on October 3, 1961, a motion was filed to amend the complaint. These latter three came more than six months after December 28, 1960, the date of the § 8(a) (5) violation.
 
 
 77
 Thus the question is presented whether the charge of September 23, 1960, is effective to include the subsequent violation on December 28. Both the Company and the Board agree that the controlling case on this point is N. L. R. B. v. Fant Milling Co., 360 U.S. 301, 79 S.Ct. 1179, 3 L.Ed.2d 1243. In that case a charge was filed in May 1954. In October the Company granted an unlawful unilateral wage increase. In January the Board proceeded with the May charge and considered the violation which occurred in October. The Supreme Court upheld the action of the Board, ruling that the Board in formulating a complaint and finding a violation of the Act can take cognizance of events occurring subsequent to the filing of the charge upon which the complaint is based, when such subsequent events are related to the conduct alleged in the charge and grow out of such conduct while the proceeding is pending before the Board.
 
 
 78
 The Company contends that in the instant case the violation is not related to the prior charge; that it bargained in good faith up to December 28, according to the findings of the Board; and that the cause of action, if any, arose on that date.
 
 
 79
 We hold that the tenor of the opinion of the Supreme Court in N. L. R. B. v. Fant Milling Co., 360 U.S. 301, 79 S.Ct. 1179, 3 L.Ed.2d 1243, supra, calls for the same result in this case. The Court said: "A charge filed with the Labor Board is not to be measured by the standards applicable to a pleading in a private lawsuit. Its purpose is merely to set in motion the machinery of an inquiry, N. L. R. B. v. Indiana & M Electric Co., 318 U.S. 9, 18, 63 S.Ct. 394, 400, 87 L.Ed. 579 [586]. The responsibility of making that inquiry, and of framing the issues in the case is one that Congress has imposed upon the Board, not the charging party. To confine the Board in its inquiry and in framing the complaint to the specific matters alleged in the charge would reduce the statutory machinery to a vehicle for the vindication of private rights. This would be alien to the basic purpose of the Act." 360 U.S. at 307, 79 S.Ct. at 1183, 3 L.Ed.2d 1243. Although the Court went on to warn that this was not to imply that the Board is to be left "carte blanche to expand the charge as they might please, or to ignore it altogether," the opinion accords a degree of latitude in this respect, to the end that the Board may administer the Act effectively.
 
 
 80
 Further relying upon § 10(b), the Company asserts that on September 12, 1961, a charge was filed alleging that the Company refused, in August, to reinstate certain strikers. The Company relies on Greenville Cotton Oil Co., 92 N.L.R.B. 1033, enf., 197 F.2d 326 (C.A. 5), which held that § 10(b) precludes the Board from finding that a company has violated § 8(a) (3) by refusing to reinstate unfair labor practice strikers, if the unfair labor practice which caused the strike occurred more than six months prior to the charge. This case would seem to be authority for the Company's contention. The Trial Examiner, in the instant case, attempted to distinguish Greenville Cotton on the basis that there no charge had been filed with respect to the unfair labor practices which caused the strike. In a subsequent case, which reached a contrary result from Greenville Cotton, the Court attempted to distinguish the earlier case, but then said that in any event the Board's decision in Greenville Cotton reaches an illogical conclusion. N. L. R. B. v. Brown & Root, Inc., 203 F.2d 139, 146 (C.A.8). The Court reasoned that the charge was not based upon failure to bargain, but upon the Company's refusal to reinstate strikers whose status was such as to entitle them to reinstatement. Applying this reasoning to the case at bar, the refusal to reinstate occurred in August, and the charge so alleging was filed in September and therefore was timely. We hold that this is the more logical approach.
 
 
 81
 Related to the same point, the Company argues, somewhat alternatively, that it notified the Union on February 8, 1961, of the names of employees who had been permanently replaced, and that the alleged violation of § 8(a) (3) occurred at this time, and the charge filed September 12 was more than six months later and therefore not timely. We agree with the Trial Examiner in his disposition of this question: "[T]he violation alleged is not replacement of the strikers, which is not in itself unlawful, but the refusal to reinstate them upon application, which did not occur until August 1961."
 
 
 82
 We accordingly hold that the six-month limitation prescribed by the statute does not bar the charges upon which the order of the Board in this case is based.
 
 
 83
 (h) We now come to the alleged § 8 (a) (1) violations. Both the Examiner and the Board found that certain minor supervisory employees made statements coercive in nature. We take up each supervisor in turn.
 
 
 84
 Earl Goforth: employee Lairson testified that Goforth asked him to come back to work because Goforth understood that if enough strikers returned to work, along with the replacements hired thus far, the Company would put into effect the contract offered to the Union.
 
 
 85
 The Company correctly points out that an employer is free to communicate with and solicit economic strikers, so long as there is no threat or promise of benefit. N. L. R. B. v. Bradley Washfountain Co., 192 F.2d 144, 153 (C.A.7); N. L. R. B. v. Wooster Div. of Borg-Warner Corp., 236 F.2d 898, 905 (C.A.6). The Board says, however, that this statement by Goforth went beyond permissible limits, citing N. L. R. B. v. Wooster Div. of Borg-Warner Corp., supra. In that case there was a clearer promise of benefit. Here the statement by Goforth seems relatively harmless, and quite obviously was no more than the expression of a personal opinion.
 
 
 86
 Kenneth Page: employee Lairson said that Page told him "You won't get nothing out of it [the Union]." Page testified that Lairson had originated the conversation and that he (Page) had only said "in my opinion we would lose more than we would gain."
 
 
 87
 Richard Schneider: employee Smith testified that Schneider told him "he was just afraid that the Company might move to Indiana or someplace where labor was cheaper." Schneider denied making this statement, but the Trial Examiner credited Smith.
 
 
 88
 Elmer Gibson: when asked by employee Underwood how the Company felt, Gibson said "he did not expect this company to give us a contract," and expressed the opinion that the Company would try to "drag it out."
 
 
 89
 As regards Schneider and Gibson, the Trial Examiner acknowledged that their statements were "couched in terms of an expression of personal opinion." This, argues the Company, should have settled the matter, since expressions of opinion are allowable. It has been said that "a prediction not coupled with a threat to use the employer's economic power to make the prediction a reality" is permissible. N. L. R. B. v. Rockwell Mfg. Co., 271 F.2d 109, 118 (C.A.3). Here none of these minor supervisors was in a position to make his opinion a reality.
 
 
 90
 Furthermore, the opinions expressed by all four of these minor supervisory employees proved to be erroneous. The Company did not put into effect for the benefit of returning strikers and replacements the contract that had been offered to the Union. Although many of the strikers "got nothing out of the strike," they were offered a contract containing substantial improvements over existing benefits which exceeded the benefits provided at the Company's other plants in the United States. No officer of the Company at the policy making level is shown to have threatened to move the plant to another location. Rather than "dragging it out" the Company bargained in good faith during at least twenty-seven meetings.
 
 
 91
 The Board cites N. L. R. B. v. Kingsford, 313 F.2d 826, 832 (C.A.6), where it was said: "Even though such statements may be expressive of opinion only, if their reasonable tendency is coercive in effect, they are violative of Section 8(a) (1)." It should be noted, however, that the statements in the Kingsford case were reaffirmed by the president of the Company in an address to the employees on the eve of a representation election, which poses a situation far different from the comments shown to have been made by the four minor supervisory employees in the instant case.
 
 
 92
 We therefore set aside and deny enforcement of that part of the Board's order holding the Company to be guilty of § 8(a) (1) violations.
 
 
 93
 (i) The Union challenges the action of the Trial Examiner in granting a motion by the General Counsel to strike the names of four strikers from the complaint over the objection of the charging party. The motion of the General Counsel was as follows: "I move to delete those persons because in view of the General Counsel, they have engaged in misconduct which disqualifies them from reinstatement." It is charged that the Board was in error in allowing the issue of the misconduct and reinstatement rights of these four strikers to have been decided unilaterally by the General Counsel, rather than to have made the decision itself after consideration of the testimony and the evidence.
 
 
 94
 The record shows that three of the strikers in question were fined $100 each by the Common Pleas Court of Butler County, Ohio, on October 11, 1960, for contempt of Court in threatening, assaulting and subjecting to physical violence employees of the Company, and one of them was found guilty by a jury of assault and battery and fined $100 on November 28, 1960.
 
 
 95
 Under the provisions of § 10(b) of the Act, 29 U.S.C. § 160(b): "Any such complaint may be amended by the member, agent, or agency conducting the hearing or the Board in its discretion at any time prior to the issuance of an order based thereon." Under § 3(d), 29 U.S.C. § 153(d), which was enacted subsequently, "The General Counsel of the Board * * * shall have final authority, on behalf of the Board, in respect of the investigation of charges and issuance of complaints under section 160 of this title, and in respect of the prosecution of such complaints before the Board."
 
 
 96
 There can be no doubt that the General Counsel himself could have stricken the four names from the motion to amend the complaint before submitting it, since he had the power to refuse to issue a complaint initially. N. L. R. B. v. Fred P. Weissman Co., 170 F.2d 952, 954 (C.A.6), cert. denied, 336 U.S. 972, 69 S.Ct. 942, 93 L.Ed. 1122; Anthony v. N. L. R. B., 204 F.2d 832, 833 (C.A.6). The Union argues that he had no right to reverse the procedure and do what otherwise amounted to the same thing, by first offering the motion and then moving to strike the four names.
 
 
 97
 The General Counsel, like the Board, is charged with the responsibility of representing the public interest, not that of private litigants. When, in the prosecution of a complaint, facts come to his knowledge showing that there was insufficient basis for proceeding thereon, it was his duty to make a motion to amend. International Union of Electrical, Radio and Machine Workers v. N. L. R. B., 110 U.S.App.D.C. 91, 289 F.2d 757, 760; American Newspaper Publishers Ass'n v. N. L. R. B., 193 F.2d 782 (C.A.7), cert. den., 344 U.S. 812, 73 S.Ct. 10, 97 L.Ed. 632.
 
 
 98
 We hold that the General Counsel gave a valid reason for striking the names of the four strikers and that the Trial Examiner properly granted the General Counsel's motion. Failure to hear evidence concerning the alleged misconduct of these four strikers did not constitute an abuse of discretion. We reemphasize that, even if their names had not been stricken, and even if they had been found not to have been guilty of misconduct, these four strikers would not have been entitled to reinstatement because they had been permanently replaced prior to December 28, 1960.
 
 
 99
 (j) Finally the Company contends that the Board erred in ordering it to continue to bargain with the Union after the certification year had expired and it had become doubtful whether the Union still represented a majority of the employees. The original election vote was only 122 to 112 for the Union. In light of the large number of strikers who were permanently replaced, there would be substantial ground for doubt concerning the Union's majority status. Jackson Mfg. Co., 129 N.L.R.B. 460; Titan Metal Mfg. Co., 135 N.L.R.B. 196. Since the Company had well-founded doubts about the Union's majority status, it could have refused to bargain at the expiration of one year after the Union's certification. Brooks v. N. L. R. B., 348 U.S. 96, 75 S.Ct. 176, 99 L.Ed. 125; N. L. R. B. v. Superior Fireproof Door & Sash Co., 289 F.2d 713 (C.A.2); N. L. R. B. v. Minute Maid Corp., 283 F.2d 705 (C.A.5); Celanese Corp. of America, 95 N.L.R.B. 664; Stoner Rubber Co., 123 N.L.R.B. 1440. This assumes, as was true in this case, that the Company did not commit an unfair labor practice which was responsible for the Union's loss of majority. N. L. R. B. v. Superior Fireproof Door & Sash Co., supra; N. L. R. B. v. Florida Citrus Canners Cooperative, 288 F.2d 630, 638, (C.A.5) rev. and reman., 369 U.S. 404, 82 S.Ct. 853, 7 L.Ed.2d 829, initial decision aff'd, 311 F.2d 541 (C.A.5).
 
 
 100
 The General Counsel contends that because the Company was guilty of refusing to bargain in good faith during the last two and a half months of the certification year, the Board, in fashioning an appropriate remedy, could require the Company to continue bargaining. The Board asserts that this was a matter within its discretion, but does not contend that such a result is required by the Brooks case, supra, which held that the employer has a duty to bargain during the certification year notwithstanding the Union's loss of its majority status.
 
 
 101
 The Board's order, under the facts of this case, overlooks two practical and important facts. First, with the withdrawal of its superseniority proposal on August 10, 1961, the Company resumed good faith bargaining, meeting twice with the Union, without result, before the hearing in this case began on October 3, 1961. Secondly, we are faced with the Union's obvious loss of its majority status. A realistic view of the situation demonstrates the futility of requiring the Company to continue negotiations with this Union, Perry Coal Co. v. N. L. R. B., 291 F.2d 126, 128 (C.A.7); N. L. R. B. v. Florida Citrus Canners Cooperative, supra, unless and until the Union has been duly certified as bargaining representative following a new election, N. L. R. B. v. Superior Fireproof Door & Sash Co., supra.
 
 
 102
 It is appropriate to note here a statement by Judge Friendly in the Superior Fireproof Door case: "Nor may we forget that the interests to be protected are primarily those of the employees, importantly including, of course, their right to effective representation, rather than of the union itself." 289 F.2d at 724.
 
 
 103
 In view of the lengthy good faith bargaining which has transpired, the expiration of the certification year, and the Union's loss of its majority status, we hold that the Company is no longer required to bargain with this Union. This part of the order of the Board is set aside and enforcement of the Board's order in this respect is denied.
 
 
 104
 Petitioners have raised certain other points which we find not to be well taken.
 
 
 105
 Accordingly enforcement of the order of the Board is denied with respect to the alleged Section 8(a) (1) violations and insofar as the Company is directed to continue negotiations with the Union. In all other respects enforcement of the order is granted.
 
 
 
 Notes:
 
 
 *
 Senior Circuit Judge, First Circuit, sitting by designation
 
 
 [1]
 The Company operates eight plants in the United States and two in Canada. All but one of these are organized
 
 
 [2]
 There is a marked disagreement as to the effect of these two disputed proposals. In its brief the Union says that the Company "withdrew benefits which the employees had enjoyed for as long as any witness could remember" and charges that the Company's "stubborn, bigoted adherence to its position * * * reveals its initial ulterior purpose." The Trial Examiner found that part of the transfer proposal "represented a potential net gain to the employees," under which some transferred employees would be "worse off" and some "better off" and that the proposal concerning accumulation of seniority during lay off would benefit employees laid off for more than six months and be less favorable for employees laid off for less than six months
 
 
 [3]
 Thus a nonstriker, returning striker, or newly hired employee who worked on October 15, for example, would have greater seniority for layoff or recall than an unreplaced striker who did not return to work until October 16. Therefore the proposal would have deprived returning unreplaced strikers of all their accumulated seniority for purposes of layoff and recall
 
 
 [4]
 The Company refers to this proposal as "special seniority" and the Union and the Board describe it as "superseniority." In this case the two terms have the same meaning
 
 
 [5]
 Section 10(c) of the Act, 29 U.S.C. § 160(c) provides in part as follows:
 "If upon the preponderance of the testimony taken the Board shall be of the opinion that any person named in the complaint has engaged in or is engaging in any such unfair labor practice, then the Board shall state its findings of fact and shall issue and cause to be served on such person an order requiring such person to cease and desist from such unfair labor practice, and to take such affirmative action including reinstatement of employees with or without back pay, as will effectuate the policies of this subchapter".
 
 
 
 106
 O'SULLIVAN, Acting Chief Judge (dissenting).
 
 
 107
 I am unable to agree with my brothers' disposition of the Statute of Limitations questions involved. The statute, § 10(b) of the Act, Title 29 U.S.C.A. § 160(b) reads in part as follows:
 
 
 108
 "Provided, That no complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board * * *." (Emphasis supplied)
 
 
 109
 The Board's findings of an 8(a) (3) violation — discrimination in regard to hire — and an 8(a) (5) violation — refusal to bargain — Title 29 U.S.C.A. § 158 (a) (3) and (5), were both "based upon" conduct of respondent which occurred on December 28, 1960. As to the 8(a) (5) violation, no charge was ever made "based upon" such conduct and as to the 8(a) (3) violation, no charge "based upon" such conduct was filed within six months of December 28, 1960.
 
 
 110
 Relying on N. L. R. B. v. Fant Milling Co., 360 U.S. 301, 79 S.Ct. 1179, 3 L.Ed. 2d 1243, the Board found that some charges of unfair labor practice, made prior to the December 28, 1960 conduct, permitted it to consider this latter conduct under the earlier charges. Therefore, it argued that such earlier charges tolled the running of the Statute of Limitations as to the 8(a) (5) violation. I am unable to follow this reasoning. Neither Fant nor National Licorice Co. v. N. L. R. B., 309 U.S. 350, 60 S.Ct. 569, 84 L.Ed. 799, also relied upon by the Board, had anything to do with the Statute of Limitations. Fant merely held that it was permissible for the Board, in passing upon a charge of unfair labor practices, to consider conduct occurring subsequent to the date of the original charge where the subsequent unfair labor practices are "related to those alleged in the charge" and "grow out of them while the proceeding is pending before the Board." In the case at bar, the conduct described in the earlier charges was found not to amount to unfair labor practices. In Fant, the conduct described in the earlier charges was found to be illegal and that which occurred after the filing of the original charge was considered as merely a prolongation of the earlier illegal conduct. I cannot understand how charges made on September 23, October 20, and December 7, 1960, and found to be groundless can be used to toll the running of the statute against events which had not yet occurred and which were never made the subject of a charge of unfair labor practice. Considering that neither Fant nor National Licorice dealt with a question of limitations, I cannot find them to be pertinent here.
 
 
 111
 As to the 8(a) (3) violation, under which the Board ordered reinstatement of some 38 employees, the unfair labor practice that the complaint was "based upon" was the December 28, 1960 conduct of respondent causing "the bargaining negotiations to reach an impasse." Such conduct, so held the Board, converted what had been an economic strike into an unfair practice strike. The charge which sought the order for reinstatement under 8(a) (3) was not made until September 23, 1961, some nine months after the unfair labor practice of December 28, 1960. My brothers hold that the statute did not begin to run on the 8(a) (3) violation until August 3, 1961 when replaced employees were denied reinstatement. Any right to such reinstatement existed only because the unfair labor practice of December 28, 1960 converted the strike into an unfair labor practice strike as of that date. That was the conduct that the September 13, 1961 charge was "based upon." It was an "unfair labor practice occurring more than six months prior to the filing of the charge with the Board * * *," § 10(b).
 
 
 112
 The Board and my brothers follow the case of N. L. R. B. v. Brown & Root, Inc., 203 F.2d 139, 146 (C.A.8, 1953). While it contains some facts different from the case before us, I recognize the Brown and Root case as contrary to my view. I respectfully disagree with its holding. I prefer the reasoning of Greenville Cotton Oil Co., 92 N.L.R.B. 1033, affirmed sub. nom. American Federation of Grain Millers v. N. L. R. B., 197 F.2d 451 (C.A.5, 1952). In our case there was nothing to prevent the employees' union, which was quite active in this regard during the strike, to have made a timely charge that respondent's December 28, 1960 conduct was an unfair labor practice. Such charge would have tolled the statute and would permit a complaint "based upon" it to be issued should respondents thereafter deny reinstatement to strikers replaced after the strike had become an unfair labor practice strike. The majority holding would expose an employer to the sanctions imposed for unfair labor practice no matter how long after their occurrence the offended employees wait to make a charge and seek a remedy. I believe that the language of the United States Supreme Court in Local Lodge No. 1424, International Association of Machinists v. N. L. R. B., 362 U.S. 411, 80 S.Ct. 822, 4 L.Ed.2d 832 supports my view. The court there said:
 
 
 113
 "[A] finding of violation which is inescapably grounded on events predating the limitations period is directly at odds with the purposes of the § 10(b) proviso." 362 U.S. 422, 80 S.Ct. 829, 4 L.Ed.2d 832.
 
 
 114
 I would hold that any charge based on the December 28, 1960 unfair labor practice is barred by § 10(b) of the Act.