

Robert E. Ackerberg, Chicago, Ill., Schiff, Hardin, Waite, Dorschel & Britton, Chicago, Ill., of counsel, for petitioner.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Solomon I. Hirsh, Attorney, N.L.R.B., Washington, D. C., Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, Allison W. Brown, Jr., Richard S. Rodin, Attorneys, N.L.R.B., for respondent.

Before SCHNACKENBERG, KNOCH and KILEY, Circuit Judges.

**CAPITOL AVIATION, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 15173.**

United States Court of Appeals
Seventh Circuit.

Jan. 28, 1966.

Kiley, Circuit Judge, dissented.

KNOCH, Circuit Judge.

On October 31, 1962, the International Association of Machinists, AFL-CIO, hereinafter called the "Union," was certified by the National Labor Relations Board as the bargaining representative for the employees of Capitol Aviation, Inc., petitioner herein, sometimes hereinafter called "Capitol," after an election in August, 1962, in which the Union prevailed by a vote of 29 to 26. There were six challenged ballots. The Board sustained four. The remaining two were not considered as they could not affect the results of the election.

Negotiations for an agreement began in November, 1962. On November 7, 1962, the Union filed charges against Capitol, in which no allegation was made

that Capitol was not bargaining in good faith. On March 8, 1963, a settlement agreement between the Union and Capitol was approved by the Board's Regional Director.

Subsequently on May 27, 1963, the Union did file charges alleging a general refusal by Capitol to bargain in good faith, and on July 19, 1963, the Board's Regional Director wrote a letter to Capitol withdrawing his approval of the settlement agreement on the ground that Capitol failed to bargain in good faith by insisting on a contract terminating at the end of the certification year and by granting unilateral wage increases.

On July 23, 1963, the Union filed further charges, and on August 16, 1963, the Regional Director consolidated all three cases and issued an amended consolidated complaint alleging specific violations of Sections 8(a)(1) & (3) of the National Labor Relations Act, and the two specific Section 8(a)(5) violations mentioned above, all prejudicial allegations being denied by Capitol.

On October 8, 1963, at the outset of the hearing, the Trial Examiner allowed the General Counsel to amend by adding allegations of bad faith bargaining on and after May 24, 1963, with no intent to enter into an agreement.

After hearing the evidence, the Trial Examiner granted Capitol's motion to dismiss the complaint in its entirety. He explained that he refused to look behind the settlement agreement because he found no post settlement violations. He found an overall record of diligent bargaining on the part of Capitol during the course of which about 79 contract clauses were agreed upon, with only 8 unresolved on April 16, 1963, of which four more were resolved by September 12, 1963, when negotiations broke off.

The General Counsel relied only on Capitol's attitude toward contract duration and union security. When negotiations began, the Union sought to require all employees to join the Union after 30 days of service. In June, 1963, the Union proposed a modification requiring present Union members to remain members and all new employees to join, with a further modification limited to maintenance of present membership.

Capitol negotiators consistently maintained the position that any form of union security clause was inconsistent with the industry practice, referring to a survey made of fixed base aircraft operating firms in the Springfield, Illinois, area. Butler Aviation, whose contract the Union was using as a negotiation guide, did have such a provision. This was entirely consistent with Capitol's report that "one or two" companies might have a union security arrangement but that the majority did not. Capitol negotiators also pointed out that while Butler was to a certain extent a fixed base operation, it did not attempt the same type of airplane modification and service work as did Capitol. With respect to its own parent, Sangamo Electric Company, Capitol stated that it was also in a different industry as well as constituting a separate organization. The Capitol negotiators were acting under instruction from Ross Bennett, who became Capitol's president in January, 1963, whose decisions were made independently of those of Sangamo, and who favored giving each individual employee a free choice with no coercion to join a union.

Pursuant to this same policy, Capitol also refused to settle the issue by an election with a majority vote determining the insertion of a union security clause for the whole unit. Mr. Bennett did follow a practice of clearing merit increases in pay with the Union before putting them into effect during the course of these negotiations.

Because of the close vote, Capitol advised the Union that it opposed a contract term extending beyond the year of certification. Capitol negotiators were frankly dubious of the continuance of the Union's small majority, and again pursuant to Capitol's policy of not coercing its employees, sought a term ending October 31, 1963.

Their misgivings were justified. By April, at the latest, management learned

that a petition expressing a desire for a new election, which was circulated by one of their employees, had been signed by 33 out of the 58 employees in the bargaining unit. In June when a strike was called, only 20 employees answered the strike call. The Board placed little weight on this last factor as indicating a loss of the Union's majority, but it seems to us that so small a response to a strike call can hardly have operated to dissipate Capitol's doubts of the Union's majority.

The Trial Examiner heard and saw the witnesses and was thus best fitted to determine the credibility of the Capitol witnesses who testified to the reason underlying Capitol's insistence on these two points. Nevertheless, the Board concluded that the initial request for the certification year term was born in bad faith and could not be justified by any subsequent events which proved that doubts of the Union's continuing majority would have been well founded, even though these events occurred during the course of the negotiations.

It is the Board's feeling that insistence on so short a term reflects on the good faith of the bargainers in the absence of compelling reasons. The Board sees such insistence as conflicting with the statutory aim of achieving industrial stability, pointing out that only 7 weeks of the term would be left when negotiations broke off. Had the Union been willing to respect Capitol's position a much longer term would have been available to carry out the Union's mandate on behalf of its members and to consolidate its own position.

Unlike the Board, we believe it was entirely reasonable that so slim a majority in an election should give rise to doubts of its continued existence under the normal turnover of employees in the course of a year. We believe that compelling reasons were present.

In Philip Carey Mfg. Co., Miami Cabinet Div. v. N.L.R.B., 6 Cir., 1964, 331 F.2d 720, 734, cert. den. 379 U.S. 888, 85 S.Ct. 159, 13 L.Ed.2d 92, the court recognized as well founded a good faith doubt of the union's continuing majority based initially on the slender margin of victory in the election.

Further, the mere fact that the Union offered repeated modifications of its demand for a union security clause did not operate, as the Board seems to believe, to make Capitol's stand on freedom of choice for individual employees improper. The Board notes that the names of other firms included in the survey were not mentioned, but at no time was the validity of the survey questioned. One exception to the general rule in the industry was stated by the Union. Capitol had observed that there were one or two exceptions. The name of the parent company was noted and the difference in its operations discussed. The Board gives Capitol no credit for its concession by way of offering a checkoff provision to assist the Union in collection of dues. The Board itself, however, has not condemned an adamant stand against union security where the employer was willing to discuss the issue even though such discussions proved fruitless. McCulloch Corp., 132 NLRB 201, 211 (1961).

The Board considered that Capitol's firm position on the union security and contract term issues outweighed its flexibility on more than 80 other issues, which the Board dismisses as equivalent to "concessions here and there."

The Board therefore went back of the settlement agreement (as the Trial Examiner declined to do) to consider the charges of unfair labor practices which were disposed of in that settlement, although only post settlement charges were litigated.

The Board assumes that Capitol was the guilty party. Thus the Board contends that the four months prior to the settlement agreement ought to be added to the certification year for bargaining purposes and that this factor makes Capitol's insistence on an October 31, 1963, termination date more reprehensible.

We cannot agree that the Board has merely drawn different inferences from

the Trial Examiner's findings on the credibility of the witnesses and his decisions on disputed facts.

If Capitol's witnesses stated the real motivation for Capitol's position, as the Trial Examiner found, then there is no reasonable basis for the Board's conclusion that Capitol was bargaining in bad faith. Unlike the Trial Examiner, the Board evidently did not believe that Capitol's survey of industry practice was a valid survey or that it formed any part of the basis for Capitol's position on union security clauses. Nor did the Board believe Capitol's witnesses who said that Capitol's position on union security was independent of that of its parent company.

█ In our judgment, the Board's findings of bad faith are not supported by any substantial evidence in the record. Universal Camera Corp. v. N.L.R.B., 1951, 340 U.S. 474, 496, 71 S.Ct. 456, 95 L.Ed. 456; Flack v. N.L.R.B., 7 Cir., 1963, 327 F.2d 396, 400; N.L.R.B. v. Porter County Farm Bureau Co-op. Ass'n Inc., 7 Cir., 1963, 314 F.2d 133, 144.

Capitol's petition to set aside the Board's order is granted. The Board's cross-application for enforcement of its order is denied.

Enforcement denied.

KILEY, Circuit Judge (dissenting).

I respectfully dissent. I think the record as a whole supports the decision of the Board that the Company refused to bargain in good faith upon the issues of Union security and contract duration.

The examiner dictated his oral findings and conclusion into the record and the Board stated that this fact compelled the Board to write "a complete and detailed decision." There is no conflict in the testimony which placed the examiner in a better position than that of the Board in deciding these issues.

The examiner in a brief sentence stated the successive Union proposals, from Union Shop to Modified Union Shop to maintenance of membership; in two brief sentences he stated the Company's only counter-proposal and that the Company "opposed Union Shop" on the ground that it interfered with free choice of the employee regarding representation. He concluded that he found no evidence of bad faith. He made no reference to the Company's opposition to maintenance of membership, and did not relate the Company's position on contract duration to its opposition to Union security or to the record as a whole.

The Board found that the Company met the Union Shop and Modified Union Shop proposals on the basis that they did not give employees a free choice of membership or non-membership, and that an employee should not be required to join a union against his will to keep employment; and that when the final maintenance of membership proposal was made, the Company objected that this did not give members freedom to resign. It found that the Union offered to conduct an election among employees on Union security and to withdraw its proposal if a majority voted against it, provided that if a majority voted for it, the Company would agree to the proposal, and that this offer was rejected. It found, as the examiner did, that the only counter-proposal was the check-off, revocable by employees. It reviewed the Company's testimony with respect to its insistence that Union security was inconsistent with the industry practice. Its conclusion pointed to weaknesses in the Company's testimony on industry practice and to the shift in Company position from its early rejection of Union proposals because of requirement of joining, to its final rejection of maintenance of membership because it deprived employees of freedom to resign.

The Board should not be bound here by an earlier decision which justified "an adamant stand against union security where the employer was willing to discuss the issue. * * *" The adamant stand the Board saw here was in the very unwillingness of the employer to discuss the issue.

At the same time that the Company was rejecting the proposals for any kind

of Union security it was likewise insisting that any contract term should not extend beyond a year from the October 31, 1962, certification because of the narrow Union majority in the election and the fact that the employees had never lived under the Union and should be given an opportunity a year from the certification to express themselves. Even the examiner was troubled about the reasonableness of this position, under which if all matters in issue had been resolved late in August—when the Company was still persisting in that position—there would be but a two month contract.

The examiner's oral decision stated that under prior Board cases an employer could insist on a "short-time" contract so as to test the Union majority status at the end of a certification year "provided" that there was no contention of bad faith in negotiations, and then concluded that "as I find no such context here," there was no warrant for a finding of violation of Section 8(a)(5). The basis of this conclusion was the narrow margin of the Union victory in the election and the subsequent employees' petition and the unsuccessful strike.

Since the Company's position on duration of contract was the same from the very beginning, based on the slenderness of the majority of the Union, the Board could properly infer that the Company could not have had a good faith doubt at that time about the Union status. And what later happened with respect to the employees' petition and the strike did not put the original reason for the Company position in any different light.

The decision in Philip Carey Mfg. Co., Miami Cabinet Div. v. N.L.R.B., 331 F. 2d 720, 724, 734 (6th Cir. 1964), relied on by the majority, is not controlling. There the certification year had ended and a strike had caused permanent replacement of enough Union members to justify the court's holding that "Since the Company had well-founded doubts about the Union's majority status, it could have refused to bargain at the expiration of one year after the Union's certification."

It is my view here that the Board could reasonably infer that the Company, while frustrating the bargaining with respect to the Union security clause, "desired to prevent its employees" from living under the Union for a reasonable time; that despite the fact that during the negotiation 75 clauses on other matters were agreed upon, the Board could find that the Company from the very beginning "took the adamant positions it did to frustrate bargaining"; and that the Company was guilty of an unfair labor practice in refusing to bargain in good faith.

I would deny the petition to set aside the Board's order.